Michael Anthony **SANDERS,**
Appellant (Defendant),

v.

The **STATE of Wyoming,**
Appellee (Plaintiff).

No. 99–48.

Supreme Court of Wyoming.

July 6, 2000.

Rehearing Denied Aug. 3, 2000.

Representing Appellant: Sylvia Lee Hackl, State Public Defender; Donna D. Domonkos, Appellate Counsel; T. Alan Elrod, Assistant Appellate Counsel; Scott Mitchel Guthrie, Assistant Public Defender. Argument by Mr. Guthrie.

Representing Appellee: Gay Woodhouse, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Georgia L. Tibbetts, Senior Assistant Attorney General; Theodore E. Lauer, Faculty Director, Emily R. Rankin, Student Intern, and Patrick Moran, Student Intern, of the Prosecution Assistance Program. Argument by Ms. Rankin and Mr. Moran.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and HILL, JJ.

GOLDEN, Justice.

Michael Anthony Sanders (Sanders) appeals his conviction on one count of first degree murder in violation of Wyo.Stat.Ann. § 6–2–101(a) (Lexis 1999).[1] Sanders challenges the trial court's refusal to instruct the jury on the offense of voluntary manslaughter, and its admission of a statement given to police by his co-defendant. Finding no abuse of the trial court's discretion in either of those rulings, we affirm.

## ISSUES

In his initial brief Sanders raises this issue:

Did the district court deprive Appellant of his due process right to a fair trial, and abuse its discretion by refusing to offer the jury the defense's theory of the case in-

---

**1.** Wyo.Stat.Ann. § 6–2–101(a) (Lexis 1999) reads: Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate, any sexual assault, arson, robbery, burglary, escape, resisting arrest, kidnapping or abuse of a child under the age of sixteen (16) years, kills any human being is guilty of murder in the first degree.

struction and a manslaughter instruction, when the evidence clearly warranted such instruction, as a lesser-included offense?

Sanders offers this issue in a supplemental brief:

> Whether the admission of Sharay Burnett's out of court statement to police officers was a violation of Michael Sanders' sixth amendment right to confrontation and not harmless beyond a reasonable doubt.

The State's brief contains this statement of the issues:

> I. Did the district court properly refuse to instruct the jury on the offense of voluntary manslaughter?
>
> II. Did the district court properly admit into evidence the out-of-court statements of Sharay Burnett under Wyoming Rule of Evidence 804(b)(3), which excepts statements against penal interest from the hearsay rule?

## FACTS

The facts of this case are presented in our decision on the appeal of Sanders' co-defendant, Sharay Burnett. *Burnett v. State*, 997 P.2d 1023, 1025 (Wyo.2000).

In September 1997, Burnett and the victim moved in together and planned to be married. On October 8, 1997, Burnett's friend called her on the telephone. Sometime during their conversation, her friend had to use the restroom. He gave the telephone to Michael Sanders, and Sanders and Burnett conversed for several hours. Two evenings later, Sanders visited Burnett and the victim at their home. Sanders and the victim drank beer while Burnett cleaned another part of the home. The victim became intoxicated and despondent, and he told Sanders and Burnett he wanted to die. Sanders, obliging and resourceful, fashioned a weapon from a disposable razor, a plastic spoon, and a piece of electrical tape. Burnett filled the bathtub with water, kissed the victim goodbye, and went into the bedroom to chant and meditate. The victim got into the bathtub.

Within a few minutes, Burnett heard the victim scream repeatedly, "Please, I changed my mind. I don't want to do this. I changed my mind." When she went to the bathroom to investigate, she saw the victim was injured, but still alive. Sanders told Burnett he needed a sharper knife and specifically asked for a steak knife, which Burnett obtained for him from her kitchen. Burnett returned to the bedroom, where she heard the victim continue to plead with Sanders. She returned to the bathroom in time to see Sanders stab the victim in the neck with the steak knife. Burnett lit a cigarette for Sanders, and then she sat by the door while Sanders stabbed the victim several more times.

Burnett and Sanders agreed that, if anyone inquired about the victim, they would say he went to get beer and marijuana but never returned. They walked to a liquor store to purchase beer and snacks, and then they returned to the house where they talked until about five o'clock in the morning. Later that morning, Sanders told a co-worker about the killing, showed him the victim's body, and asked for help in disposing of it. The co-worker called the police, and the police proceeded to the house where they found Burnett and the body. After the police informed Burnett of her rights, she gave a detailed rendition of the previous night's events.

Sanders was arrested that same morning and charged with one count of first degree murder. His trial commenced on October 19, 1998. He was convicted and sentenced to life in prison. Sanders appeals his conviction to this Court.

## DISCUSSION

### *Standard of Review*

Sanders' claims of error concern jury instructions and the admission of evidence. We review a trial court's rulings in both of those areas under our abuse of discretion standard. *Duckett v. State*, 966 P.2d 941, 943–44 (Wyo.1998); *Humphrey v. State*, 962 P.2d 866, 870 (Wyo.1998). We have described that standard as follows:

> We perceive the core of our inquiry as reaching the question of reasonableness of the choice made by the trial court. Hence-

forth, we will turn to a definition adopted in *Martin v. State*, 720 P.2d 894, 897 (Wyo. 1986), in which we said:

> Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria: it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Byerly v. Madsen*, 41 Wash.App. 495, 704 P.2d 1236 (1985).

*Vaughn v. State*, 962 P.2d 149, 151 (Wyo. 1998).

### Jury Instruction

In his first assignment of error, Sanders scores the trial court for refusing his proffered jury instruction on voluntary manslaughter.[2] We review a refusal of a proposed lesser-included offense instruction by applying the following test:

> The trial judge must first determine if all the elements of the lesser offense are found within the greater; and, if so, is there some evidence that would rationally permit the jury to find the accused guilty of the lesser and not guilty of the greater offense. If such evidence is present, the instruction should be given.

*State v. Keffer*, 860 P.2d 1118, 1140 (Wyo. 1993) (Cardine, J., concurring). *See also Paramo v. State*, 896 P.2d 1342, 1344 (Wyo. 1995) ("A district court's failure to give a lesser included offense instruction when such an offense indeed exists, and the evidence presented would support conviction upon that offense, constitutes reversible error. *Eatherton v. State*, 761 P.2d 91, 95 (Wyo.1988).")

Sanders contends, and we agree, that voluntary manslaughter is a lesser-included offense of first degree murder. *See Warren v. State*, 835 P.2d 304, 322 (Wyo. 1992) (Urbikit, C.J., dissenting). The first part of the *Keffer* test is therefore satisfied. The second part of the *Keffer* test requires us to determine whether the evidence presented at trial would have rationally permitted the jury to find Sanders guilty of manslaughter but not guilty of first degree murder. Sanders contends that the evidence supports a conclusion that he killed the victim but did so without malice. That characterization of the evidence, if accurate, would support a manslaughter instruction. In support of his claim that he killed without malice, Sanders points to testimony that he bore no ill will toward the victim; the victim asked Sanders to kill him; the two men· drank beer together as new friends; and Sanders felt sorry for the victim.

We have accepted a definition of malice as an "intentional killing without legal justification or excuse and under circumstances which are insufficient to reduce the crime to manslaughter." *Braley v. State* 741 P.2d 1061, 1069 (Wyo.1987). Thus, his claim is sustainable if the evidence at trial would allow the jury to reasonably conclude that he killed the victim with legal justification, or under circumstances that reduce the crime to manslaughter.

Sanders claims legal justification from the testimony that the victim wanted to die and asked Sanders to kill him. While there exists no Wyoming statutory or case law directly on point, an abundance of authority from other sources demonstrates the rule that a victim's consent to be killed is not a defense to a homicide charge. *Gentry v. State*, 625 N.E.2d 1268, 1273 (Ind.App.1993) ("First, consent is not a defense to conduct causing another human being's death."); *State v. Couser*, 567 N.W.2d 657, 660 (Iowa 1997) ("A substantial number of cases from other jurisdictions hold that one who actually performs or actively assists in performing an overt act resulting in the death of another person is guilty of homicide, irrespective of the victim's desire to die."); 40 Am.Jur.2d *Homicide* § 105 (1999) ("In application of the general principle that private persons cannot license crime, so that the criminal cannot be excused

---

**2.** Wyo.Stat.Ann. § 6–2–105(a) (Lexis 1999) reads:
  A person is guilty of manslaughter if he unlawfully kills any human being without malice, expressed or implied, either:
  (i) Voluntarily, upon a sudden heat of passion; or

(ii) Involuntarily, but recklessly except under circumstances constituting a violation of W.S. 6–2–106(b).

by anyone's consent thereto, it is the rule that, in a prosecution for homicide, consent of the deceased is no excuse. The right to life and to personal security is not only sacred in the estimation of the common law, but it is inalienable.") Sanders, therefore, cannot show that he was legally justified in killing the victim.

To convince this Court that he killed the victim under circumstances that reduce the crime to manslaughter, Sanders would need to show that he acted in the heat of passion. We have accepted the following definition of that term:

> "Heat of passion" means such passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same or similar circumstances as those in question which would cause him to act rashly, without reflection and deliberation, and from passion rather than from judgment.

*Yung v. State*, 906 P.2d 1028, 1036 (Wyo. 1995). Sanders does not even attempt to convince us that he acted "from passion rather than from judgment." Such an attempt would be unavailing for two reasons. First, the victim's plea for death and Burnett's acquiescence therein are not the type of circumstances to which a reasonable person would react with a deadly passion. Second, there is no evidence that Sanders did in fact kill the victim in the heat of passion. Instead, the evidence clearly contradicts such a claim. Sanders refused to kill the victim until Burnett consented, hardly the act of someone consumed by passion. In addition, fashioning a weapon from three separate components is not a hallmark of passion, but an indication of planning and deliberation.

Sanders further argues that he was too intoxicated at the time of the killing to form the requisite intent for first degree murder. The State responds to Sanders' intoxication claim in two ways. First, while first degree murder is a specific intent crime, second degree murder is not; therefore, the absence of specific intent could reduce the charge to second degree murder but not to manslaughter. Second, the jury was instructed on the

defense of intoxication but convicted Sanders nonetheless.

The evidence at trial cannot support a lesser-included offense instruction for manslaughter because there is no evidence that Sanders killed without malice in the heat of passion. In addition, Sanders' claim of voluntary intoxication does not require a manslaughter instruction. We, therefore, hold that the trial court did not abuse its discretion by refusing Sanders' proffered manslaughter instruction.

### Admission of Burnett's Statements

■ Sanders next contends that the trial court erred by admitting into evidence statements Sharay Burnett made to a police detective. He argues that those statements were hearsay, and their admission violated his right to confront the witnesses against him. "Hearsay evidence is ordinarily inadmissible; however, it can be received in evidence if it falls within one of the exceptions to the hearsay rule found in the Wyoming Rules of Evidence and it bears sufficient indicia of reliability to avoid violation of the Confrontation Clause." *Johnson v. State*, 930 P.2d 358, 361–62 (Wyo.1996). Sanders' brief disputes many of Burnett's statements that were not admitted at trial and fails to contest some that were admitted. We will, therefore, examine all the admitted statements for error.

■ Under W.R.E. 804(b)(3), statements that were against a declarant's penal interests when made are excepted from the hearsay rule if the declarant is unavailable to testify.[3] That exception applies to statements that are self-inculpatory, including those that are "intertwined or closely connected to statements that another was also involved" and applies "even if spreading the blame serves the interests of the declarant." *Brown v. State*, 953 P.2d 1170, 1178 (Wyo. 1998).

■ The following exchanges took place during the State's direct examination of the detective who questioned Burnett:

---

**3.** Sanders' trial counsel conceded that Burnett was not available to testify because her appeal of her conviction was pending at the time of Sanders' trial.

Q. During the course of your interview with Sharay Burnett, did she ever state that there came a time when there was formed some kind of an agreement or understanding between herself and Mr. Sanders that [the victim] would die?

A. Yes.

Q. Explain that, if you would.

A. Mr. Sanders had approached Sharay and said that he could not kill [the victim] without her permission. And she subsequently gave her permission by answering, yeah, whatever.

Q. Did he specifically ask her the question, do I have your approval to do this?

A. Correct.

Q. And she responded?

A. Yeah, whatever.

The statements of Burnett recounted above were clearly against her penal interests when made because they could aid her prosecution on a charge of conspiracy to commit murder. The next recorded admission of Burnett's statement is:

Q. According to Sharay Burnett, how long did this episode involving [the victim] and his death—when did it end?

A. Less than an hour, it concluded a little after 1:00 in the morning.

Q. According to Sharay Burnett, were there any other discussions between herself and Mr. Sanders after this initial part that you testified, do I have your approval? Were there any other discussions after that between herself and Mr. Sanders as to how [the victim] would die?

A. Yes.

Q. What did she state they discussed?

A. They discussed that they would use a razor. Sharay recollects that it was Mike Sanders who broke the razor; that it was herself, Sharay, who provided the pipe with the tape on it.

Q. This is the marijuana pipe we heard about?

A. Correct, and it was Mike Sanders who had the spoon. That it was Mike Sanders who attached the blade of the disposable razor to the spoon using electrical tape.

These statements are even more inculpatory because Burnett not only conspired, she knowingly provided a portion of the intended murder weapon. The next use of Burnett's statements continues along the same lines:

Q. And who affixed the blade to the spoon handle?

A. Mr. Sanders did.

Q. According to him?

A. According to him and Sharay.

Although this portion is more inculpatory of Sanders than of Burnett, it shows that Burnett knew what was happening, agreed to the plan, and did nothing to stop it. In addition, the information is substantiated not only by Sanders' statement to the detectives, but also by Sanders' testimony at trial. The use of Burnett's statements continued with:

Q. As it concerns the course of events that we talked about thus far—do I have your approval, and the preparations of this instrument—what act did Ms. Burnett say she did herself?

A. She provided the pipe with the tape on it.

Q. Who ran the bath water?

A. She did.

Q. Moving on, according to Sharay Burnett, did she reflect to you in your interview with her any statements made by [the victim] once this agreement had been set in motion after this instrument has been prepared, after [the victim is] in the bathtub, did she reflect any statements made then by [the victim]?

A. Yes, sir, she did.

Q. Lay that out, if you would, so we know the context and what was said.

A. Sharay was in her bedroom, which is a common wall to the bathroom, and she heard [the victim] scream out, "Please stop. I changed my mind."

Q. Did she indicate in the course of your interview how many times this was said by [the victim]?

A. She said over and over, 10, 20 times.

Q. You used the words scream out. Were those her words?

A. Yes.

Q. "Please stop. I've changed my mind." Anything else?

A. If you want to refer me to the correct page.

Q. Page 30, page 31.

A. Her statement?

Q. Yes, sorry.

A. "Please, I changed my mind. I changed my mind."

Q. As it goes into page 31, any other statements made?

A. "Please, I changed my mind. I don't want to do this. I changed my mind."

Q. You indicated where was [the victim] at that time?

A. In the bathtub in the upstairs bathroom.

Q. Did she indicate she could hear any noises in addition to the statements?

A. Yes.

Q. What noise?

A. Thrashing of the water. The water was turned on in the tub. Thumping sounds.

Q. So hearing this thrashing and the water rushing, the noises, and please stop, what did she state she did?

A. She left the bedroom and went towards the bathroom.

These statements are also self-inculpatory. The beginning of this exchange revisits Burnett's culpability for conspiracy and her part in preparing the intended weapon. The latter part shows that Burnett knew the victim was struggling and pleading for his life, yet she did nothing to assist him or summon help. The testimony continued with:

Q. Sharay moves to the bathroom area. Was there any conversation then she related to you between herself and Mr. Sanders?

A. Yes.

Q. What was that conversation?

A. Mr. Sanders asked Sharay if they had a sharper knife.

Q. And how did she respond?

A. She stated no.

Q. Did she state she could hear anything coming out of the bathroom at that time?

A. She could hear [the victim] gurgling.

Q. Any other conversation between herself and Mr. Sanders?

A. Mr. Sanders asked if they had a steak knife and Sharay said she did.

Q. What did she do?

A. She walked downstairs to the kitchen area and retrieved the steak knife.

Q. What did she do with it?

A. Walked up the first set of stairs to the landing, and she gave it to Mike Sanders.

In the above exchange, Burnett admitted again that she heard the victim's plight and took no action to prevent his death. In addition, she provided a second weapon after the first one failed. The same information was presented again, as recorded below:

Q. Let's go back and do that sequence to make sure it's—after the point in time where you have got Sharay Burnett where she told you she is in her bedroom and she hears, "Please stop. I changed my mind," from [the victim], you indicated she went to the bathroom doorway. What conversation then was had, according to Ms. Burnett?

A. According to Ms. Burnett, Mike Sanders asked her if she had a sharper knife, where she responded no. Mike Sanders then asked her if she had a steak knife, and she responded yes.

Q. And then what did Miss Burnett state she did, after saying, yeah, I got a steak knife?

A. She went to the kitchen downstairs and retrieved the knife.

Q. What did Ms. Burnett state she did with that knife?

A. Back up the staircase, and about the landing of that staircase, Ms. Burnett

stated this is when she gave this knife to Mike Sanders.

The final use of Burnett's statement is recorded as:

Q. Turning back then to your interview with Ms. Burnett. At this point in time where she hands the knife to Mr. Sanders on the landing of the stairs, did she indicate there was any further conversation between herself and Mr. Sanders then?

A. Yes.

Q. What did she state that was?

A. That—according to Ms. Burnett, that Mike Sanders had stated that they had to finish it; that it had gone too far.

Q. Did she agree with this?

A. Yes.

Q. According to Ms. Burnett, where did they then go?

A. They went back to her bedroom.

Q. Did she state she heard anything from [the victim] at that time?

A. Yes.

Q. What did she say she could hear from [the victim]?

A. [The victim] was saying please.

Q. Did she indicate she heard any statements from Mr. Sanders at that time?

A. Yes, she did.

Q. What did she state he was saying?

A. Mr. Sanders was stating, "Let go of my arm. Let go of my arm. Lay your arms down."

Q. Afterwards, sticking still with your interview with Ms. Burnett, [the victim] is dead, any conversation then about cover-up, what to say, what to do?

A. Yes, it was.

Q. What did Ms. Burnett state that conversation was?

A. That Mike instructed her if anyone should ask concerning [the victim], she should tell them that [the victim] left with two Mexicans to go buy some beer and marijuana.

Q. Did she agree that she could do that?

A. Yes, she did.

Q. And you had discussion about disposing of the body?

A. Yes, Mr. Sanders said that he would take care of that.

In this final excerpt, Burnett admitted that she conspired with Sanders to cover up the murder, another statement clearly against her penal interests.

Having determined that Burnett's statements were admissible under the rules of evidence, we must next, in accordance with our standard articulated in *Johnson*, determine whether they bear sufficient indicia of reliability to avoid violation of the Confrontation Clause. We hold that they do. First, the statements were very incriminating of Burnett. In fact, Burnett's entire statement to the detective was admitted at her trial; she was convicted as an accessory to first degree murder and sentenced to life imprisonment. *See Brown,* 953 P.2d at 1179–80 ("the very fact that a statement is self-inculpatory is itself one of the particularized guarantees of trustworthiness that makes a statement admissible under the Confrontation Clause.") Second, Burnett was not offered any leniency in exchange for her statement, as evidenced by her conviction and life sentence. *Id.* at 1180. Finally, much of the detailed information in Burnett's statement is corroborated by Sanders' statement and testimony, the testimony of other witnesses, and the physical evidence presented at trial. *Id.* An example of that corroboration is her mention of the steak knife, which law enforcement officials did not locate until several days after Burnett's statement.

Burnett's statements to the detective were properly admitted under our rules of evidence and bore sufficient indicia of reliability. We, therefore, hold that its admission at trial was not an abuse of the trial court's discretion. Because the trial court did not err in the admission of that testimony or in its instructions to the jury, we affirm Sanders' conviction and sentence.