2008 WY 102

**Kent Alan PROFFIT, Sr. Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. S–07–0210.**

Supreme Court of Wyoming.

Aug. 29, 2008.

Representing Appellant: Diane M. Lozano, State Public Defender; Tina N. Kerin, Appellate Counsel. Argument by Ms. Kerin.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Leda M. Pojman, Assistant Attorney General. Argument by Ms. Pojman.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶ 1] This is an appeal from a conviction for conspiracy to commit first-degree murder, for which conviction the appellant was sentenced to imprisonment for life without the possibility of parole.[1] Finding no error in the challenged evidentiary decisions or the denial of the motion for a change of venue, we affirm.

## ISSUES

[¶ 2] 1. Whether the district court abused its discretion or violated the appellant's constitutional right to confrontation in allowing an investigator to testify, over a hearsay objection, that the murder victim earlier had reported that the appellant had threatened him?

2. Whether the district court abused its discretion or violated the appellant's constitutional right to confrontation in allowing an investigator to testify, over relevancy and unfair prejudice objections, that the murder victim had reported that the appellant had sexually assaulted him?

3. Whether the district court committed plain error in allowing witness Martinez to testify about statements made to him by non-witness Hicks?

4. Whether the district court abused its discretion in denying the appellant's motion for a change of venue?

## FACTS

[¶ 3] This is one of numerous cases involving the appellant and several co-conspirators. In late 2005, the appellant was charged with sexually assaulting his stepson, B.C. While out on bond awaiting trial on those charges, the appellant moved into a trailer house occupied by his son "Bubba," Jacob Martinez, Christopher Hicks, and Jeremy Forquer. Michael Seiser was a frequent visitor at the trailer. Forquer was murdered on October 28, 2005. B.C. was murdered on November 25, 2005. Martinez, Hicks, and Seiser have all been convicted of various homicide crimes as a result of these murders. The appellant was convicted of first-degree murder and conspiracy to commit first-degree murder in Forquer's death, and he was convicted of eight counts of sexual assault involving B.C. In the instant case, the appellant was convicted of conspiracy to commit the murder of B.C. Other facts will be developed as they relate to the separate issues.

## DISCUSSION

*Whether the district court abused its discretion or violated the appellant's constitutional right to confrontation in allowing an investigator to testify, over a hearsay objection, that the murder victim earlier had reported that the appellant had threatened him?*

[¶ 4] This case is about the murder of B.C., which murder occurred approximate-

1. *See* Wyo. Stat. Ann. § 6–2–101(a), (b) and § 6–1–303(a) (LexisNexis 2007).

ly three weeks before B.C. was to testify, as the victim, in the appellant's sexual assault trial. In its pretrial notice of intent to introduce uncharged misconduct evidence, the State noted that it intended to introduce evidence that B.C. had reported to investigators that the appellant had told B.C. that if he ever reported the sexual assaults, and as a result the appellant went to prison, B.C. "would be dead first." After the State's notice was filed, the appellant moved *in limine* to preclude as evidence any statements B.C. may have made, on the ground that such statements would be hearsay. During several pretrial hearings, discussions occurred among court and counsel as to whether evidence of B.C.'s report of the alleged threat was probative of motive for the killing, such discussions indicating that the evidence was being considered as uncharged misconduct evidence under W.R.E. 404(b).[2] In the end, the objection was treated as a hearsay objection, coupled with an argument that the appellant was being deprived of his right to confront the witnesses against him.[3]

[¶ 5] We review decisions as to the admission of evidence for an abuse of discretion. *Martin v. State*, 2007 WY 76, ¶ 20, 157 P.3d 923, 928 (Wyo.2007). The burden is on the appellant to establish an abuse of discretion. *Id.* Hearsay generally is inadmissible, but it may be admitted if it falls within one of the recognized exceptions to the rule, and it is sufficiently reliable. *Sanders v. State*, 7 P.3d 891, 895 (Wyo.2000). The district court's decision regarding the alleged violation of the appellant's constitutional right to confrontation, being a question of law, is reviewed *de novo*. *Sincock v. State*, 2003 WY 115, ¶ 19, 76 P.3d 323, 332 (Wyo. 2003).

2. W.R.E. 404(b) provides as follows:
(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

3. The Sixth Amendment to the United States Constitution reads in pertinent part as follows:

[¶ 6] The first step in this review is to identify the particular statement at issue. At trial, the investigating officer testified as follows as to B.C.'s reporting of the alleged sexual abuse and the alleged threat:

Q I'd like to direct your attention to early July of 2005. At that time period, did you have occasion to interview [B.C.]?

A Yes, I did.

Q *During the course of your interview with [B.C.], did he identify for you that he had been assaulted in a sexual nature by an individual he identified as Kent Proffit, Senior?*

A *Yes, he did.*

Q During the course of that disclosure, did [B.C.] advise you that he had been threatened by Kent Proffit, Senior at any time?

A Yes, he did.

Q What specifically did [B.C.] tell you he had been told by Kent Proffit, Senior?

A *Kent Proffit told [B.C.] that, you should know if I go to—have to go to prison, you'll be dead first.*

Q And did [B.C.] identify for you if you have to go to prison, what that was in reference to?

A It was in reference to a threat from him to keep him from reporting the incidents.

Q Okay. Did [B.C.] identify for you when he was threatened in that manner?

A Yes, it was the summertime of 2002.

(Emphasis added.)

[¶ 7] The district court admitted this testimony under the "catchall" hearsay exception found in W.R.E. 803(24).[4] In doing so, the district court also applied the "forfeiture by wrongdoing" exception to applicability of the constitutional confrontation clause. The

"In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...."

4. The record does not reflect why the testimony was admitted under W.R.E. 803(24), rather than under W.R.E. 804(b)(6), which latter rule is the "catchall" hearsay exception for situations in which the declarant is unavailable, including unavailability caused by death. *See* W.R.E. 804(a)(4).

latter exception, which we find to be dispositive as to this issue, was first articulated by the United States Supreme Court in *Reynolds v. United States,* 98 U.S. 145, 158, 25 L.Ed. 244 (1878):

> The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated.

[¶ 8] In *Crawford v. Washington,* 541 U.S. 36, 54, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004), the Court held that the confrontation clause "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding." Very recently, in *Giles v. California,* 554 U.S. ——, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008), the Court identified "forfeiture by wrongdoing" as one such common law exception. The holding of *Giles* most pertinent to our present discussion is that forfeiture by wrongdoing does not apply unless the wrongful conduct of the defendant was specifically designed or intended to prevent the witness from testifying. *Id.* at ——, 128 S.Ct. at 2687.

[¶ 9] The district court in this case was very careful in applying the forfeiture by wrongdoing doctrine. The court held a pretrial hearing on the issue, and it deferred ruling until several State witnesses had testified at trial, clearly linking B.C.'s death to the appellant's wrongful conduct, and clearly establishing that B.C. was killed specifically to silence him as a witness against the appellant. We are satisfied that the facts and procedures of this case meet the dictates of *Giles.* Furthermore, given the underlying rationale of the forfeiture by wrongdoing doctrine, we believe the doctrine should be applied in this murder case, even though B.C. was killed with the primary intent of preventing him from testifying in the sexual assault case. For purposes of the doctrine, the two cases are inextricable.

[¶ 10] The remaining question is whether, given application of the forfeiture by wrongdoing doctrine, it was also necessary for the State to satisfy a hearsay exception to have B.C.'s statement admitted. We think not. In addressing this question, the United States Supreme Court said the following in *Giles:*

> No case or treatise that we have found, however, suggested that a defendant who committed wrongdoing forfeited his confrontation rights but not his hearsay rights. And the distinction would have been a surprising one, because courts prior to the founding excluded hearsay evidence in large part *because* it was unconfronted. See, *e.g.,* 2 Hawkins 606 (6th ed. 1787); 2 M. Bacon, A New Abridgment of the Law 313 (1736). As the plurality said in *Dutton v. Evans,* 400 U.S. 74, 86, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), "[i]t seems apparent that the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule stem from the same roots."

*Giles,* 554 U.S. at ——, 128 S.Ct. at 2686.[5] Forfeiture by wrongdoing is part of the common law that has been adopted by Wyoming. Wyo. Stat. Ann. § 8–1–101 (LexisNexis 2007). Given that the common law right of confrontation and the common law hearsay rule "stem from the same roots," it would be illogical to apply forfeiture by wrongdoing to the constitutional right, while denying its application to the rule of evidence.[6]

---

5. For an analysis of the conflicting state approaches to the question of whether a separate forfeiture exception under the rules of evidence should be necessary, *see* 5 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8:134 (3d ed. Supp. 2008).

6. In reaching this conclusion, we do not consider it controlling that Wyoming has not "codified" forfeiture by wrongdoing, as has been done in Fed.R.Evid. 804(B)(6). The doctrine exists as part of the common law.

*Whether the district court abused its discretion or violated the appellant's constitutional right to confrontation in allowing an investigator to testify, over relevancy and unfair prejudice objections, that the murder victim had reported that the appellant had sexually assaulted him?*

[¶ 11] In its Notice of Intent to Introduce WRE 404(b) Evidence, the State declared its intent to introduce evidence of B.C.'s report that "he was the victim of several sexual assaults perpetrated by" the appellant, with the evidence being relevant to prove the appellant's specific intent to kill B.C. In response, the appellant filed an objection and a memorandum of law in which he argued that, while the State might be allowed to introduce evidence that the appellant was facing criminal charges, and that B.C. was going to testify at the trial, evidence that those criminal charges were sexual in nature was unfairly prejudicial, when compared to its probative value.[7] A separate motion *in limine* again raised the above-discussed hearsay and confrontation issues.

[¶ 12] These matters were argued at a pretrial hearing on March 16, 2007. Unfortunately, because the discourse during that hearing failed to distinguish well between B.C.'s threat report and B.C.'s sexual assault report, and also failed to distinguish well among the defense theories of uncharged misconduct evidence, hearsay, unfair prejudice, and the confrontation clause, the hearing transcript is of little assistance to our review. In any event, the district court took the matters under advisement, rather than ruling from the bench. As noted above, the district court eventually allowed the investigator to testify about both the threat report and the sexual assault report.

[¶ 13] We review decisions as to the admission of evidence for an abuse of discretion. *Martin,* 2007 WY 76, ¶ 20, 157 P.3d at 928. We give considerable deference to such decisions, and will not overturn them so long as there exists a legitimate basis for the ruling. *Law v. State,* 2004 WY 111, ¶ 14, 98 P.3d 181, 187 (Wyo.2004). In that regard, we

review the reasonableness of the district court's holding. *Martin,* 2007 WY 76, ¶ 21, 157 P.3d at 928. The burden is on the appellant to establish an abuse of discretion. *Id.* at ¶ 20, at 928.

[¶ 14] Our analysis of the forfeiture by wrongdoing exception to the confrontation clause applies equally to B.C.'s sexual assault report as it did to B.C.'s threat report, and we will not reiterate that analysis here. The same is true of the hearsay objection. The appellant forfeited his right to raise these issues by procuring the unavailability of B.C. as a witness. What remains for determination is whether B.C.'s report of being sexually assaulted by the appellant was more probative than it was unfairly prejudicial. In that regard, it should be remembered that the appellant did not object to admission of evidence that he was charged with a crime wherein B.C. was the victim, but only objected to admission of B.C.'s report that he was sexually assaulted.

[¶ 15] We have described many times the proper procedure to be followed by a trial court in determining whether uncharged misconduct evidence should be admitted:

(1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice; and (4) upon request, the trial court must instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.

*Gleason v. State,* 2002 WY 161, ¶ 18, 57 P.3d 332, 340 (Wyo.2002). We have no trouble readily finding that the first, second, and fourth factors of this test were met. The evidence was offered for the purpose of proving that the appellant had the intent or motive to kill B.C., and it hardly goes beyond the ken of common human understanding that a report such as B.C. made to the investigator could provide such motive or intent. The fourth factor was clearly met when the district court instructed the jury as follows:

---

7. W.R.E. 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...."

## JURY INSTRUCTION NO. 16

Evidence has been received in this case that in 2005 the Defendant was charged with a different crime, wherein [B.C.] was the alleged victim and also a potential witness against the Defendant. You are instructed that for the purposes of this trial, you must presume the Defendant innocent of that charge. Further, you may consider that charge only in terms of whether or not it establishes a motive for the crime charged in this case, and for no other purpose.

[¶ 16] As to the third element of the stated test, the following factors are to be weighed in balancing the probative value of the uncharged misconduct evidence against any danger of unfair prejudice:

1. The reprehensible nature of the prior bad act. The more reprehensible the act, the more likely the jury will be tempted to punish the defendant for the prior act.

2. The sympathetic character of the alleged victim of the prior bad act. Again, the jury will be tempted to punish the defendant for the prior act if the victim was especially vulnerable.

3. The similarity between the charged crime and the prior bad act. The more similar the acts, the greater is the likelihood that the jury will draw the improper inference that if the defendant did it once, he probably did it again.

4. The comparative enormity of the charged crime and the prior bad act. When the prior act is a more serious offense than the charged crime, the introduction of that act will tend to place the defendant in a different and unfavorable light.

5. The comparable relevance of the prior bad act to the proper and forbidden inferences. Evidence of the prior bad act may be much more probative of bad character than it is of any legitimate inference permitted by Rule 404(b).

6. Whether the prior act resulted in a conviction. The jury may be tempted to punish the defendant if they believe he escaped punishment for the prior bad act.

*Gleason,* 2002 WY 161, ¶ 27, 57 P.3d at 342. We have said that, when this Court reviews a trial court's determination to admit evidence against a W.R.E. 403 challenge, we "will not overturn a trial court's determination ... as long as a legitimate basis exists supporting the determination." *Law,* 2004 WY 111, ¶ 15, 98 P.3d at 187. Further, the appellant "must demonstrate that the evidence had little or no probative value and that it was extremely inflammatory or introduced for the purpose of inflaming the jury." *Id.* (quoting *Apodaca v. State,* 627 P.2d 1023, 1027 (Wyo. 1981)).

[¶ 17] The "prior bad act" in this case was, of course, the alleged sexual assault upon B.C. While we agree with the appellant that the allegation was of a particularly reprehensible act, and that its victim, being a minor, was particularly vulnerable, we do not believe the district court abused its discretion in admitting the evidence. The peculiarities of this case made motive perhaps the single most important fact for the State to prove. Without proof of motive, there was little that could have connected the appellant to the murder, and without evidence of the nature of the appellant's alleged crime against B.C., the jury would not have been able effectively to judge the likelihood that the reporting of such crime would create a motive to kill. Further, B.C.'s death made the investigator's hearsay testimony the best evidence of that motive. The probative value of the evidence was extremely high, and we cannot say that it was outweighed by the danger of unfair prejudice. In that regard, we note that defense counsel did a very effective job in closing argument of explaining to the jury the limitations that had to be placed upon the uncharged misconduct evidence, and in explaining how the danger of unfair prejudice followed such evidence. We also assume that a jury given a limiting instruction follows that limitation. *Marquez v. State,* 12 P.3d 711, 717 (Wyo.2000). And finally, the prejudicial effect of admitting B.C.'s statement was dulled significantly by the fact that Jacob Martinez, the actual murderer of B.C., testified that he and the appellant had discussed killing B.C. because B.C. was going to testify against the appellant in the sexual assault case. The investigator's testimony as

to B.C.'s statement was, therefore, merely cumulative.

### Whether the district court committed plain error in allowing witness Martinez to testify about statements made to him by non-witness Hicks?

[¶ 18] As a witness for the State, Jacob Martinez testified that he and Christopher Hicks, two of the trailer house occupants, were very close friends in the period before B.C. was murdered. He further testified that in September 2005, Hicks said that he had arranged for 500 pounds of marijuana to be delivered to Gillette and that the two of them were going to sell it. Subsequently, however, Hicks told Martinez that the deal had "gone bad," that they were being blamed for it, and "they threatened to kill us." When told about the situation by Hicks and Martinez, the appellant said he "was connected" and would "take care of it." A few days later, the appellant told Hicks and Martinez they owed him a favor—the killing of B.C.— for taking care of their problem.

[¶ 19] Although he did not object at trial, the appellant now claims it was plain error for the district court to admit into evidence Hicks' statements to Martinez because the statements are hearsay and because no exception applies to them.[8] To prove plain error, the appellant must show that the record is clear as to the alleged error, that an unequivocal rule of law was violated, and that the violation adversely affected a substantial right to his material prejudice. *Cazier v. State,* 2006 WY 153, ¶ 10, 148 P.3d 23, 28 (Wyo.2006).

[¶ 20] Plain error did not occur in this instance because Hicks' statements to Martinez are not hearsay. "Hearsay" is defined in W.R.E. 801(c) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." W.R.E. 801(b) identifies the "declarant" as the "person who makes a statement." In turn, W.R.E. 801(a) defines a

"statement" in relevant part as "an oral or written assertion." The keystone of the evidentiary rules governing hearsay is W.R.E. 802, which declares hearsay to be inadmissible except as provided by court rules or statute. "Hearsay is generally inadmissible because it is thought to be unreliable and untrustworthy and because there is no opportunity to confront the witness or cross-examine." *Kelly v. State,* 694 P.2d 126, 130 (Wyo.1985) (internal footnote omitted).

[¶ 21] Hicks' statements to Martinez would only be hearsay if they were being offered to prove the assertions being made by Hicks. Thus, the statements would be hearsay if they were being offered to prove, for instance, that Hicks had arranged a 500-pound marijuana deal, or that the deal had "gone bad," or that he and Martinez were being threatened with death. The statements were not, however, offered for that purpose. Rather, they were offered for the purpose of showing the effect the statements had upon Martinez and the appellant. *See Kenyon v. State,* 986 P.2d 849, 853–54 (Wyo. 1999) (credibility of the declarant not the issue).

[¶ 22] The fact that Hicks' statements were not offered to prove the truth of the matter asserted also defeats the appellant's contention that admission of the statements violated his constitutional confrontation rights. *Crawford,* itself, notes that the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford,* 541 U.S. at 59 n. 9, 124 S.Ct. at 1369 n. 9; *Schultz v. State,* 2007 WY 162, ¶ 11, 169 P.3d 81, 85 (Wyo.2007); *Szymanski v. State,* 2007 WY 139, ¶¶ 20–26, 166 P.3d 879, 884–86 (Wyo.2007). The appellant has failed to show plain error.

### Whether the district court abused its discretion in denying the appellant's motion for a change of venue?

[¶ 23] Prior to trial, the appellant filed a Motion for Change of Venue, setting forth the following contentions:

> Hicks and Martinez, who now and then sold quarter-ounces of marijuana, could orchestrate a 500-pound deal with a Mexican drug cartel.

---

**8.** The "failure" to object below was apparently intentional. Defense counsel cross-examined Martinez at great length and to considerable effect over the seemingly ludicrous story that

1. This matter has received an extraordinary amount of media coverage, particularly in the local newspaper.

2. Attached hereunto, and incorporated into this document by this reference are copies of the newspaper stories this case has generated.

3. The local talk radio show has spent a great deal of time discussing this case, however it is impossible to determine the level of prejudice this has generated.

4. The guilty conviction in Case No. 4575 has only served to exacerbate the level of media coverage, and resultant public prejudice against the Defendant.[9]

5. Due to the level of media coverage in this case, and the nature of the coverage, it is impossible to seat an unbiased jury in this matter.

[¶ 24] The motion was heard on January 19, 2007. Defense counsel argued that the threat of the death penalty required heightened due process, that venue had been changed in nearly every recent death penalty case in Wyoming, that a Campbell County jury pool would have knowledge of the appellant's conviction in the Forquer murder case and of the sexual assault allegations, that inconvenience to the court and the parties could not justify denial of the motion, and that the appellant could not receive a fair trial in Campbell County. The State responded primarily that a decision on the motion was premature, inasmuch as no attempt had yet been made to seat a local jury.

[¶ 25] The district court issued a decision letter on January 30, 2007, denying the motion to change venue. The court indicated that it had reviewed the materials submitted by the appellant relating to the case at hand, as well as the related cases involving Martinez, Hicks, and Seiser. The court found the publicity to be generally factual in nature and not so prejudicial as to prevent a fair trial. The court also noted that selection of a jury in the Forquer murder trial two months earlier had taken only a little more than one day and was "relatively easy." Finally, the court denied the motion but offered to revisit it in the event that *voir dire* revealed that recent publicity necessitated a venue change. The order of denial was filed on February 2, 2007.

[¶ 26] The decision letter and order did not end the venue question. Despite the district court's painstaking method of jury selection, the appellant repeatedly renewed his motion to change venue. The complicated jury selection process went generally as follows: The Clerk of District Court sent out 410 questionnaires to potential jurors. The district court then held periodic status conferences to determine the number of available jurors, and asked counsel to stipulate to the removal of potential jurors for cause shown in returned questionnaires. On February 21, 2007, counsel submitted just such a stipulation, removing 66 jurors for cause. A second stipulation removed an additional 106 jurors. Numerous others were excused by the court for cause unrelated to the case. Eventually, about 15 jurors were examined each day for nine days, with both general and individual *voir dire*. A final panel of 49 potential jurors was determined on March 16, 2007.

[¶ 27] The Appellant renewed his venue motion on March 16, 2007, alleging that even the 49 remaining jurors were biased due to exposure to prejudicial and inflammatory publicity about the case. In denying the motion, the district court described the "wide latitude" that had been allowed counsel during *voir dire*, described how the court had listened carefully to responses from the panel and had watched for demeanor that belied verbal responses, and opined that the final panel was "fit and proper to serve." The court then indicated that, it being Friday, it would allow three additional questions to be asked of the 49 potential jurors on Monday: (1) whether they had read anything about the case; (2) whether they knew other people on the panel; and (3) whether anyone had talked to them about the case. Finally, the court stated that, if all 49 persons remained on the panel, the appellant would get 18 peremptory challenges, the State would get 17 peremptory challenges, two alternates would be selected by random drawing, and the remaining 12 would be the jurors.

9. *Case No. 4575 was the Forquer murder case.*

[¶ 28] Monday morning's court session began with the district court having all the potential jurors stand and introduce themselves by name. The court then asked the panel as a whole the three questions noted above, with each juror who responded positively to any question being further questioned individually in private. As a result of that process, the district court excused six members of the venire, leaving 43. The parties next exercised their peremptory challenges, with the appellant having 15 challenges and the State 14. The court then denied another renewed motion for change of venue, with the following explanation:

> THE COURT: Well, and so the record will be clear, that of the five that I sent out of here today that I excused, I excused them without even asking them the threshold question, whether that would make an impact on their ability to judge this case.[10] I dismissed them out of hand for reading those news articles. I must have asked at least five times—four or five times to bring those people forward. And, again, if I'd have had more, if we'd gotten over the line, I told you last week what I would do. And I have to admit that the Court was disappointed by the fact that we had people that read those articles.
>
> It appeared to me that in calling them up here and giving them numerous chances between whether it was mere inconvenience or something else, I think we addressed everything that was humanly possible in this courtroom today.
>
> With regard, again, [Defense Counsel], to the numbers of people that may or may not have heard about this case, the people that knew anything significant about this case, if anything, it's shocking to the Court that so many people knew so little about it. If anything, that was what was shocking to me.
>
> I fully—while I had no preconceived notion about what was going to happen when we started this process, I had at least a reasonable expectation that we would not be trying this case here. And as I indicated last week, if we'd have gotten to the end of week one and had no real prospect of seating a jury, I would have ended it there and we would have moved this case someplace else. If anything, that turned out not to be true, in the vernacular, in spades.
>
> While people may or may not have heard this or that, it's amazing to me how many people had heard nothing about the case.
>
> So I'm going to deny, once again, the motion for change of venue. I've, in structuring this, tried to use an abundance of caution. I gave both sides extra peremptory challenges, as I indicated I would do last week. I gave the defense the odd number in this, so the defense would have three extra peremptories as opposed to State's two. And we have the—our 14 people now. Hopefully, we won't have any more problems, but if we do, gentlemen, trust me, I will revisit it promptly. [The] Court takes this matter very seriously and takes the integrity of the panel very seriously, and hopefully I have done so throughout the process.

[¶ 29] We recently reiterated our standard for reviewing the denial of a motion for change of venue. Because the appellant so strenuously pursued a change of venue in the instant case, and because even the district court recognized early on in the proceedings that venue might have to be changed, we will once again set forth that review standard in detail:

> Article 1, Section 10 of the Wyoming Constitution provides that criminal defendants are entitled "to a speedy trial by an impartial jury of the county or district in which the offense is alleged to have been committed." In turn, Wyo. Stat. Ann. § 1–7–102(a) (LexisNexis 2007) requires that "[e]very criminal case shall be tried in the county in which the indictment or offense charged is found, except as otherwise provided by law." Finally, W.R.Cr.P. 18 provides that, "[e]xcept as otherwise permitted by statute or by these rules, the prosecution shall take place in the county

---

10. One of the six excused veniremen was excused due to a snowmobile accident, rather than due to a violation of the court's order.

in which the offense is alleged to have been committed...." Notwithstanding these mandates, W.R.Cr.P. 21(a) allows for trial elsewhere in the event of local prejudice that is too great for the defendant to receive a fair trial:

(a) *Prejudice within county.*—Upon timely motion of the defendant, the court shall transfer the proceeding as to that defendant to another county, but only if the court is satisfied that there exists within the county where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial in that county.

. . . .

We have identified the following standard for reviewing a district court's denial of a motion for change of venue:

We review the denial of a motion for change of venue under an abuse of discretion standard, meaning we will not interfere with the trial court's decision unless the trial court acted in a manner exceeding the bounds of reason under the circumstances. *Nixon v. State,* 994 P.2d 324, 326–27 (Wyo.1999). The party moving for change of venue has the burden of showing actual prejudice in the minds of the jurors so great that a fair trial cannot be obtained. *Id.* at 327

. . . .

This Court has adopted a two-part test for determining whether a change of venue should be granted after *voir dire* because of pre-trial publicity: " 'First, the nature and extent of the publicity must be considered; second, the difficulty or ease in selecting a jury must be considered along with the amount of prejudice which actually appears during *voir dire* examination.' " *Sides* [*v. State* ], 963 P.2d [227,] 231 [ (Wyo.1998) ] (quoting *Murry* [*v. State* ], 713 P.2d [202,] 208 [ (Wyo.1986) ] ).

*Urbigkit v. State,* 2003 WY 57, ¶¶ 26–27, 67 P.3d 1207, 1220 (Wyo.2003). Prejudice will not be presumed from mere local publicity; such presumption will rarely be invoked and only in extreme circumstances. *Sanchez v. State,* 2006 WY 116, ¶ 13, 142 P.3d

1134, 1139 (Wyo.2006). To require venue to be changed, pre-trial publicity must be so inflammatory as practically to dictate the community's opinion. *Id.*

*Carothers v. State,* 2008 WY 58, ¶¶ 9, 11, 185 P.3d 1, 8–9 (Wyo.2008). Specifically in regard to high-profile cases with significant publicity, we have said the following:

It is to be expected that most of the jury panel will have heard about a sensational case, but there is no requirement that a juror be ignorant of the facts and issues involved in a case. *Wilcox v. State,* [670 P.2d 1116, 1119 (Wyo.1983) ]. The totality of the circumstances must indicate the presence of improper prejudice. *Weddle v. State,* Wyo., 621 P.2d 231 (1980). The question focuses on whether a fair jury was ultimately selected. *Shaffer v. State,* [640 P.2d 88, 103 (Wyo.1982) ]. We recently reaffirmed these basic principles in *Pote v. State,* Wyo., 695 P.2d 617 (1985).

*Murry v. State,* 713 P.2d 202, 208 (Wyo. 1986).

[¶ 30] Having carefully read the transcript of the pretrial hearings and the *voir dire* process in this case, and having read the materials accompanying the appellant's motion for change of venue, we conclude that the appellant has failed to prove that the district court abused its discretion in denying his initial motion, or any of its multitudinous renewals. The district court clearly was, and remained throughout the proceedings, open-minded about the prospect of a venue change, and carefully monitored jury selection to preserve the appellant's rights in that regard. The extent of the local publicity about this and related cases was considerable, but not remarkable under the circumstances. Further, the publicity was, by and large, factual in nature, being neither inflammatory nor judgmental. The effect of that publicity upon the venire was carefully tested, and the district court found no prejudicial impact. The record bears that out.

[¶ 31] It would have been easy for the district court in this case to have avoided the exercise of discretion, to have avoided the undoubted tediousness of protracted *voir dire,* to have ignored the systemic presump-

tion in favor of local venue for criminal trials, and to have simply granted a change of venue. That did not happen. Instead, the district court devised a very reasonable and effective scheme for unearthing any unfairly prejudicial effect from the publicity engendered by the related crimes. Questionnaires were sent to over 400 individuals, with the parties weeding out by stipulation those persons showing an obvious bias. Of those remaining, the district court allowed extensive and intensive, general and individual, *voir dire* questioning. The court and counsel even performed a special mini-*voir dire* to make sure no last-minute publicity had corrupted the panel. The district court took extraordinary precautions to make sure that the jury eventually seated had not been prejudiced by pretrial publicity.

### CONCLUSION

[¶ 32] The appellant forfeited his right to challenge the admission of B.C.'s statements to the investigator by conspiring to have B.C. murdered for the specific purpose of eliminating him as a witness. The probative value of those statements was very high in regard to the appellant's motive or intent, and that probative value was not outweighed by any danger of unfair prejudice. The district court did not abuse its discretion in allowing the investigator to testify as to B.C.'s statements. Neither did the district court abuse its discretion in allowing witness Martinez to testify about statements made to him by non-witness Hicks because those statements were not offered to prove the truth of the matters asserted, and were not, therefore, hearsay. Finally, the district court did not abuse its discretion in repeatedly denying the appellant's motion for a change of venue. The jury selection process and *voir dire* questioning resulted in the seating of an unbiased jury, despite the existence of adverse pretrial publicity.

[¶ 33] We affirm.