# IN THE SUPREME COURT, STATE OF WYOMING

## 2025 WY 5

OCTOBER TERM, A.D. 2024

January 8, 2025

MONIQUE HUIA SULLIVAN,

Appellant
(Defendant),

v.

S-24-0063

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Lincoln County*
*The Honorable Joseph B. Bluemel, Judge*

*Representing Appellant:*
　　Devon Petersen, Fleener Petersen LLC, Laramie, Wyoming. Argument by Mr. Petersen.

*Representing Appellee:*
　　Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; Donovan Burton, Assistant Attorney General. Argument by Mr. Burton.

*Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN, and JAROSH, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**GRAY, Justice.**

[¶1]     A jury convicted Monique Huia Sullivan of voluntary manslaughter for the stabbing death of her fiancé, Andrew Moore.  Ms. Sullivan challenges the district court's decisions allowing John Moore, Mr. Moore's father (Father), to testify and admitting a photo of Mr. Moore while he was alive.  Ms. Sullivan also alleges prosecutorial misconduct, contending the prosecutor presented false reasons for seeking the admission of the challenged evidence.  We affirm.

## ISSUES

[¶2]          1.     Did the district court abuse its discretion when it allowed Father to testify and admitted evidence of a photograph of Mr. Moore when he was alive?

2.     Did the prosecutor commit misconduct by advocating for the admission of the photograph and Father's testimony?

## FACTS

[¶3]     Ms. Sullivan and Mr. Moore were sheep shearers from Australia and New Zealand, respectively.  They worked with a group of sheep shearers who had traveled from New Zealand to shear sheep at various ranches around Utah and Wyoming.  On the evening of February 19, 2023, they arrived at a ranch near Kemmerer, Wyoming, the site of a shearing job.  Shortly after midnight on February 20, 2023, Ms. Sullivan killed Mr. Moore by stabbing him once in the left side with a large kitchen knife.  The State charged Ms. Sullivan with second-degree murder.[1]  The only issue at trial was whether Ms. Sullivan committed second-degree murder by stabbing Mr. Moore maliciously or whether she acted in the heat of passion or in self-defense.

### A.     The Stabbing and Its Aftermath

[¶4]     By all accounts, Ms. Sullivan and Mr. Moore had a difficult couple of days prior to the stabbing.  On February 18, 2023, they moved their shared trailer from Vernal, Utah, to Green River, Wyoming, for a small shearing job.  Ms. Sullivan testified that on that day, Mr. Moore was "angry and frustrated" because he had problems with his new truck, purchased the wrong part to repair the truck, and had trouble finding the Green River jobsite.  Other members of the crew testified the couple had a rough day when traveling to Green River due to truck problems, icy roads, and getting lost.

---

[1] Wyoming's second-degree murder statute requires the State to prove a defendant "purposely and maliciously, but without premeditation, kill[ed another] human being."  Wyo. Stat. Ann. § 6-2-104(a).

[¶5]    The next day, after finishing the Green River job, the shearing crew moved to a ranch near Kemmerer, Wyoming, for their next shearing job.  Ms. Sullivan testified Mr. Moore's mood had gotten worse.  Early in the morning of the move to Kemmerer, Ms. Sullivan texted Stacey Hikawai, another member of the crew, complaining about Mr. Moore's mood.  Ms. Sullivan texted she was "[a]bout to stab this ****"; Ms. Hikawai responded, "Still no good?"; and Ms. Sullivan replied, "LOL, nope, he's a moody ****."  Ms. Sullivan and Mr. Moore arrived in Kemmerer shortly before dark.  Ms. Sullivan testified that on their arrival, they had a flat tire and began to argue.  Ms. Sullivan changed the tire, while Mr. Moore went into their trailer.  The couple continued to argue inside their trailer.

[¶6]    Mr. Moore took a shower and then went to the trailer Ms. Hikawai shared with her boyfriend, Mya Kawana, to hang out and drink beer with Mr. Kawana.  This trailer was parked about ten feet from the Moore/Sullivan trailer.  Ms. Sullivan and Ms. Hikawai joined the men a couple of hours later.  Ms. Sullivan, still angry with Mr. Moore, returned to the Moore/Sullivan trailer.  Shortly thereafter, Ms. Hikawai followed.  Ms. Hikawai fell asleep, and Ms. Sullivan went to retrieve Mr. Moore.  Ms. Sullivan and Mr. Moore began arguing.  Mr. Kawana testified that after they left his trailer, he heard Ms. Sullivan yelling at Mr. Moore.  The argument continued as they entered their trailer, where Ms. Hikawai was sleeping.  Ms. Hikawai testified that she woke up when she heard the couple enter the trailer.  She heard them arguing before falling back to sleep.  Later, just after midnight, Ms. Hikawai heard a "thud" followed by a panicked voice saying, "[D]on't pull it out."  She, then, heard Mr. Moore ask, "[W]hy would you do that?" and saw Ms. Sullivan standing by Mr. Moore, holding a bloody knife.

[¶7]    Mr. Kawana and two other shearers, along with the ranch owner, transported Mr. Moore to the hospital in Kemmerer where he was pronounced dead.  When law enforcement officers located Ms. Sullivan at the ranch a few hours later, she had a severe, self-inflicted wound on her wrist.  Ms. Sullivan was transported to the Kemmerer hospital.  Ms. Sullivan reported to hospital staff that she had stabbed Mr. Moore.  She denied being in an altercation and denied that Mr. Moore had attacked her.  Other than her wrist wound, hospital staff saw no signs of injury or assault on Ms. Sullivan's body.

[¶8]    Lincoln County Sheriff Detective, Jody Gardner, interviewed Ms. Sullivan at the hospital.  Ms. Sullivan related that she was upset with Mr. Moore because of their truck problems, his alcohol use, and statements he made to her.  She did not report that Mr. Moore had been abusive or threatening prior to the stabbing, but she did assert that he had tried to pull her from the truck when the couple arrived in Kemmerer because she had trouble parking.  Ms. Sullivan told Detective Gardner that immediately before the stabbing she was arguing with Mr. Moore and hitting him.  She admitted she was "enraged" and "jabbed" at Mr. Moore with the knife but stated she did not realize he was so close to her.

2

## B.     Ms. Sullivan's Defense

[¶9]    Ms. Sullivan testified that Mr. Moore was violent and abusive.  She recounted incidents when Mr. Moore would "pull[ her] out of bed, push[ her], . . . grab[ her] neck and hold[ her] against walls or beds."  She relayed that he had strangled her in September 2022.  She introduced a photo of bruises on her neck from the 2022 strangling incident.  She further explained that they "were arguing in the camper we had in Australia and he came running at me so I ran out of the camper, I twisted my ankle and tripped and fell over and when I was on the ground, [he] jumped on top of me and started strangling me."

[¶10]   Ms. Sullivan testified that before Mr. Moore went to the Kawana/Hikawai trailer on the evening of the stabbing, they argued about the difficulties she had when backing up their trailer and she described Mr. Moore "ripp[ing her] out from behind the steering wheel."  She testified he "was furious, he was really furious . . . he was like yelling at me through gritted teeth," like "[t]he time he strangled me."  Ms. Sullivan reported that after she retrieved Mr. Moore from the Kawana/Hikawai trailer, they started arguing again.  She asserted that Mr. Moore pushed her to the floor.  She went on:

> [Ms. Sullivan] And then he – I was trying to get up, I was trying to get up using the counter, and he was standing over me, and then I seen [his] hands just come up and in that moment I thought – I knew, I knew he was going to strangle me so I had to defend myself.
>
> Q     Was he mad?
>
> A     He was furious, he was yelling at me through gritted teeth again.
>
> Q     Have you ever seen him that mad before?
>
> A     Yes, I have.
>
> Q     When?
>
> A     September of 2022 when he strangled me.
>
> Q     And did you think he was just going to strangle you?
>
> A     No.
>
> Q     Can you explain to the jury what you thought?

A    [He] was that angry that I knew, I knew that he was going to strangle me, that he was going to kill me.

. . .

[He] pushed me on the ground and then he was standing over me, and his hands went up. I could see his body area and his hands came straight up, and I knew he was going to kill me. I knew he was going to kill me, so I grabbed the knife and I stabbed him in the side.

## C.    The Challenged Evidence

[¶11]  Ms. Sullivan challenges the admissibility of Father's testimony and the introduction of State's Exhibit 1, a photograph of Mr. Moore wearing a swimsuit, bent at the waist and kneeling in blue water while holding onto the collar of a dog. The State called Father as its first witness.[2] Ms. Sullivan objected before Father took the stand, and the court heard arguments outside the presence of the jury. The State proffered that Father's testimony was to show that Mr. Moore "was alive," and the photograph "may be used by the medical examiner to point out on [the victim's] actual body, upright, where the wound was. . . ." It asserted "the distance from the wound to the floor is going to become very important as this case proceeds." In response, Ms. Sullivan argued that Father's testimony was irrelevant, had no probative value, and there were other exhibits the medical examiner could use to show the location of the wound. She alleged the sole purpose of "bringing the deceased's father [was] for impact and to create sympathy within the jury." The district court denied Ms. Sullivan's motion, allowed Father to testify, and admitted the photo into evidence.

[¶12]  Father testified that his son traveled around the world shearing sheep and was in Lincoln County to shear sheep. He stated Mr. Moore was engaged to Ms. Sullivan, who was also on the shearing crew and the couple shared a trailer. Father described Exhibit 1, explaining the photograph showed "my son[] and our little dog. It's the one he brought home to the family." When asked whether the photograph was "a fair and accurate" depiction of his son, Father answered, "Yes, very happy. [Mr. Moore] loved the outdoors, yes." He testified that the photograph was taken in "New Castle, that's in New Zealand,

---

[2] In its amended pretrial memorandum, the State listed Father as a "will call" witness, stating he

     will testify concerning the background of why the victim was in the United
     States. In addition, he will testify why the victim was in Lincoln County
     at the time of his death. [Father] will also testify and lay foundation
     concerning an exhibit related to a photograph of the victim with a dog.

Ms. Sullivan filed a motion to strike Father as a witness and to prevent the State from introducing the photograph as evidence. Because the motion was filed on the first day of trial, the district court did not rule on it prior to the commencement of trial.

it's one of his favorite places. He would always come back here and go to it, his favorite place."

[¶13] The medical examiner was the State's last witness. He did not reference State's Exhibit 1.

**D.    Closing Arguments, the Jury Verdict, and Sentencing**

[¶14] The district court instructed the jury on second-degree murder, the lesser included offense of voluntary manslaughter, and self-defense.

[¶15] During its closing argument, the State did not mention Exhibit 1. In her closing, Ms. Sullivan asked the jury to examine Exhibit 1 when considering her claim of self-defense, stating:

> That's a big guy, six foot two, three, well over six feet. Look at those shoulders, look at those muscles. . . . I would submit to you . . . at five foot three, he's standing over you and his hands are coming out, you're never gonna win . . . unless you defend yourself.

During its rebuttal, the State argued that Ms. Sullivan's version of the stabbing was implausible because Ms. Sullivan and Mr. Moore "had to be standing" for the knife to penetrate Mr. Moore's side where it did. The State pointed out that Ms. Sullivan claimed she was in a crouched position on the ground and Mr. Moore was standing over her in a hunched-over position with his arms reaching down toward her when she stabbed Mr. Moore. The State showed the jury Exhibit 1 and used the photograph to show where Mr. Moore was stabbed. It asked, "How is it possible that he got stabbed in that area with arms out like this bent over?"

[¶16] The jury found Ms. Sullivan guilty of voluntary manslaughter. The district court sentenced her to 12 to 17 years in prison. This appeal followed.

*DISCUSSION*

***I.    Did the district court abuse its discretion when it allowed Father to testify and admitted evidence of a photograph of Mr. Moore when he was alive?***

[¶17] Ms. Sullivan argues that the admission of Father's testimony and State's Exhibit 1 violated Rules 401, 402, and 403 of the Wyoming Rules of Evidence.

## A.     Standard of Review

[¶18]   Wyoming Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  W.R.E. 401.  Under Rule 402, unless otherwise provided by statute or rule, "relevant evidence is admissible."  W.R.E. 402.  Rule 403 provides, "[R]elevant[] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  W.R.E. 403.

[¶19]   We review a district court's ruling on the admissibility of evidence for abuse of discretion.  *Munda v. State*, 2023 WY 90, ¶ 21, 535 P.3d 523, 528 (Wyo. 2023).[3]

> A trial court's admission of evidence over a W.R.E. 403 challenge will not be overturned if "a legitimate basis exists supporting the determination.  Further, the appellant must demonstrate that the evidence had little or no probative value and that it was extremely inflammatory or introduced for the purpose of inflaming the jury."

*Id.* (quoting *Proffit v. State*, 2008 WY 102, ¶ 16, 191 P.3d 963, 969 (Wyo. 2008)).  "Finally, even if the evidence was improperly admitted, the appellant bears the burden of establishing the error caused material prejudice."  *Id.* (citing *Griggs v. State*, 2016 WY 16, ¶ 123, 367 P.3d 1108, 1142 (Wyo. 2016)).  To establish material prejudice, the appellant must show a "reasonable probability" of a more favorable verdict absent the error.  *Id.*

## B.     Father's Testimony

[¶20]   Ms. Sullivan contends that Father's testimony constituted inadmissible victim impact testimony, was irrelevant, and its probative value was outweighed by its prejudice.

---

[3] At the start of trial, Ms. Sullivan objected to the State calling Father as a witness and to Exhibit 1.  Her objections were overruled.  Ms. Sullivan made no further objection to Father's testimony.  When the State moved to introduce Exhibit 1, Ms. Sullivan stated, "[n]o objection."  Neither party suggests that plain error review ought to apply, and we do not apply it to this issue.  We note that the rationale for requiring an objection during trial is so that the trial court can consider the objection and render its decision.  "The objector should lay his finger on the particular point intended to be raised so that the trial court will have notice and an opportunity to cure the alleged error."  *Farrow v. State*, 2019 WY 30, ¶ 22, 437 P.3d 809, 817 (Wyo. 2019) (quoting *Buszkiewic v. State*, 2018 WY 100, ¶ 33, 424 P.3d 1272, 1282 (Wyo. 2018)).  This was accomplished when Ms. Sullivan filed her motion to strike Father's testimony and Exhibit 1 and when she objected to the State calling Father as a witness at trial, which the district court ruled on outside of the presence of the jury.

[¶21]  "Broadly speaking, victim impact evidence is that evidence relating to the victim's personal characteristics and to the physical, emotional, or social impact of a crime on its victim and on the victim's family." *King v. State*, 2023 WY 36, ¶ 38, 527 P.3d 1229, 1243 (Wyo. 2023) (quoting *Smith v. State*, 2005 WY 113, ¶ 15, 119 P.3d 411, 416 (Wyo. 2005)). "The key inquiry on the admissibility of victim impact testimony during the guilt phase of a criminal trial is relevancy." *Wilks v. State*, 2002 WY 100, ¶ 8, 49 P.3d 975, 981 (Wyo. 2002) (citation omitted) ("Victim impact testimony must not be permitted 'unless there is a clear justification of relevance.'" (quoting *Justice v. State*, 775 P.2d 1002, 1011 (Wyo. 1989))); *see* W.R.E. 401.[4]

[¶22]  "Generally, '[t]he testimony of victims of a crime describing how it affected their lives after the crime is irrelevant' with respect to the question of whether a crime has been committed." *King*, ¶ 38, 527 P.3d at 1243 (quoting *Hill v. State*, 2016 WY 27, ¶ 28, 371 P.3d 553, 562 (Wyo. 2016)). "Victim impact evidence is also improper if 'its only purpose [was] to attempt to arouse the passions of the jury.'" *Id.* ("[Victims'] discussion of the impact of the crime upon them could not in any way serve to establish any of the elements of the crime of aggravated robbery. The only purpose must have been to attempt to arouse the passions of the jury." (quoting *Justice*, 775 P.2d at 1010)). "Victim impact evidence may be relevant, however, for a proper purpose." *King*, ¶ 39, 527 P.3d at 1243 (In a sex abuse case, the victim's behavior after the alleged assault is relevant because it is "probative as to whether the incident occurred at all because physical or psychological trauma is the natural result of an assault." (citing cases)); *Bogard v. State*, 2019 WY 96, ¶ 25, 449 P.3d 315, 322 (Wyo. 2019) ("prosecutor may refer to victim impact evidence in argument . . . to bolster a witness's credibility after it is attacked").

[¶23]  Ms. Sullivan posits that Father's testimony that Mr. Moore was "once young, happy, and healthy, in his favorite spot with the family dog he presumably rescued" was not relevant to the sole issue in this case—whether Ms. Sullivan acted maliciously or in self-defense.  The State contends that Father's testimony provided relevant background information and a foundation for Exhibit 1.[5]

[¶24]  We have explained that "[a] certain amount of background information about an alleged victim in a criminal case . . . is entirely appropriate." *Solis v. State*, 2013 WY 152, ¶ 51, 315 P.3d 622, 633 (Wyo. 2013).  Father's testimony describing Mr. Moore's sheep shearing profession and the reason he was in Lincoln County with Ms. Sullivan was not victim impact evidence.  Rather, it furnished appropriate and relevant background information to the jury and was not unfairly prejudicial.  *See Brown v. State*, 2014 WY 104, ¶ 28, 332 P.3d 1168, 1176 (Wyo. 2014) (evidence that victim's mother had recently

---

[4] Trial courts may consider oral or written victim impact statements prior to imposing a sentence.  Wyo. Stat. Ann. §§ 7-21-101 through -103; *Wilks*, ¶ 8, 49 P.3d at 981.  Victim impact statements arising at trial are not regulated by these statutes.

[5] We address Exhibit 1, *infra* at ¶¶ 28–32.

7

died was proper because it provided background explaining why the victim had been living with the defendant prior to the crime); W.R.E. 403. Admission of that testimony did not constitute an abuse of discretion.

[¶25] Conversely, Father's testimony concerning Mr. Moore's demeanor, his favorite vacation spots, and the family dog did not assist the State in proving any elements of the crime alleged, and it was not relevant background information.

[¶26] The State argues Father's testimony was relevant "to rebut [Ms.] Sullivan's attack on [Mr.] Moore's character." It concedes that it "did not rely on [Father's] testimony as character evidence" but argues "it likely could have done so . . . ." *See* W.R.E. 404(a)(2)[6] (character evidence of a victim is admissible to rebut defendant's evidence regarding victim's character or that victim was first aggressor in a homicide case). While Father's testimony regarding Mr. Moore's demeanor might have been relevant character evidence on rebuttal, it was not admissible in the State's case-in-chief. We have explained, "The prosecutor is not allowed to bootstrap relevancy in the first instance by what it subsequently" might have offered in rebuttal testimony. *Wilks*, ¶ 10, 49 P.3d at 982.

[¶27] Father's testimony describing Mr. Moore's demeanor, his favorite vacation spots, and the family dog was irrelevant and should not have been admitted. W.R.E. 402. Ms. Moore's objections to Exhibit 1 correspond to her objections to Father's testimony, and we consider Ms. Sullivan's arguments pertaining to that exhibit before turning to the question of material prejudice. *See Munda*, ¶ 21, 535 P.3d at 528.

## C. State's Exhibit 1

[¶28] Ms. Sullivan contends that Exhibit 1, the photograph of Mr. Moore taken while he was alive and at the beach with the family dog, was irrelevant and was introduced "solely to arouse the passions of the jury."

[¶29] In *Wilks*, we addressed the admissibility of "in-life" photographs of homicide victims and said,

---

[6]         (a)     *Character Evidence Generally.* – Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

.  .  .

(2)     Character of Victim. – Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor . . . .

W.R.E. 404(a)(2).

8

> Photographs of homicide victims taken during life should be admitted to the jury only under very limited circumstances:
>
>> Photographs of [homicide] victims [taken while alive] are inadmissible unless they are relevant to some material issue and their relevancy outweighs the danger of prejudice to the defendant. . . . [W]here there is no purpose in introducing such pictures into evidence, such admission invokes the sympathy of the jury and constitutes error.

*Wilks*, ¶ 13, 49 P.3d at 982 (citation omitted).

[¶30]   In *Wilks* the appellant claimed the trial court erred when it allowed the introduction of an in-life photograph of the victim.  The State showed the victim's photograph to the victim's husband and asked him to identify it.  Defense counsel objected.  It argued the defense was not contesting the victim's identification and the photograph was irrelevant and prejudicial because it tended to invoke sympathy for the victim.  The State argued the photograph was relevant to show that the victim was alive.  *Wilks*, ¶ 12, 49 P.3d at 982. We recognized that the prosecution has the burden of proving all elements of the crime, including the identity of the victim.  *Id.* ¶ 13, 49 P.3d at 983.  We also recognized that "relevant photographs do not become inadmissible when the defendant concedes [the victim's identity] and cause of the victim's death."  *Id.* (citation omitted).  Nevertheless, we cautioned against the use of in-life photos where there is "potential to inflame the jury." *Id.*   In *Wilks*, without deciding whether the court erred in admitting the photograph, we held its introduction was not prejudicial.  *Id.* ¶ 14, 49 P.3d at 983.  Other courts have affirmed admission of in-life photographs of homicide victims where identity is an issue. *See, e.g.*, *State v. Thurber*, 420 P.3d 389, 436 (Kan. 2018) (in-life photograph relevant to prove identity of victim); *Boyd v. State*, 663 S.E.2d 218, 220 (Ga. 2008) (photograph of victim and family relevant to establish victim's identity); *Grandison v. State*, 506 A.2d 580, 602 (Md. 1986) (trial court did not abuse its discretion when it admitted in-life photographs where they were relevant to issue of the victim's identity).  Here, the State did not claim Exhibit 1 was relevant to prove Mr. Moore's identity.

[¶31]   At trial the State made two arguments regarding the relevance of Exhibit 1.  It argued that the medical examiner "may" use the photograph to point out where the stab wound was on Mr. Moore's body.  The State also asserted that the photograph was relevant to show Mr. Moore was alive before he was stabbed.  The medical examiner never referred to Exhibit 1.  While the photograph showed Mr. Moore alive at some time prior to the stabbing, several witnesses testified that Mr. Moore was alive on the night of the stabbing. The State did not need this evidence.  Exhibit 1 was not relevant for either of the reasons proffered by the State.

9

[¶32]   On appeal, the State offers additional argument on the relevance of Exhibit 1.   It contends the photograph was relevant to rebut Ms. Sullivan's claim of self-defense because it showed Mr. Moore "hunched over" with his arms reaching down, the position in which Ms. Sullivan testified Mr. Moore was in prior to the stabbing.   During its rebuttal closing, the State used the photograph to point out where Mr. Moore was stabbed and to illustrate its claim that both Mr. Moore and Ms. Sullivan "had to be standing" for the knife to penetrate where it did.   In her closing, Ms. Sullivan argued that the photo showed the size and strength disparity between Mr. Moore and Ms. Sullivan.   At the time the photograph was admitted—the first exhibit in the State's case-in-chief—Ms. Sullivan had not yet presented her case or presented testimony regarding her theory of self-defense.   Like Father's testimony, *supra*, the photograph might have been relevant on rebuttal, but it was not relevant in the State's case-in-chief and should not have been admitted.   W.R.E. 402. *See Wilks*, ¶ 10, 49 P.3d at 982.

## D.   Prejudice

[¶33]   Having found that Exhibit 1 and certain parts of Father's testimony were not relevant and should not have been admitted, we turn to the question of prejudice.   Ms. Sullivan bears the burden of establishing that admission of Father's testimony and Exhibit 1 materially prejudiced her.   *Munda*, ¶ 21, 535 P.3d at 528 (citing *Griggs*, ¶ 123, 367 P.3d at 1142).    To establish material prejudice, an appellant must show a "reasonable probability" of a more favorable verdict absent the error.[7]   *Munda*, ¶ 21, 535 P.3d at 528;

---

[7] Ms. Sullivan argues that to establish prejudice she must establish a "reasonable ***possibility*** that the verdict might have been more favorable" absent the error.   (Emphasis added.)   We have previously addressed this argument.

> While "reasonable possibility" and "reasonable probability" appear to connote different standards, in the context of appellate review, that difference is illusory. *See generally Strickler v. Greene*, 527 U.S. 263, 300, 119 S.Ct. 1936, 1957, 144 L.Ed.2d 286 (1999) (Souter and Kennedy, JJ., concurring in part and dissenting in part) ("[W]hile 'reasonable possibility' or 'reasonable likelihood' . . . and 'reasonable probability' express distinct levels of confidence concerning the hypothetical effects of errors on decisionmakers' reasoning, the differences among the standards are slight."). On appellate review, it is difficult to discern a practical distinction between the two words.   Rather, the concern is whether the alleged error undermines confidence in the outcome. *See id.* at 300–01, 119 S.Ct. at 1957–58 ("[G]iven the soft edges of all these phrases, the touchstone of the enquiry must remain whether the . . . [error] 'undermines our confidence' that the factfinder would have reached the same result.").   If it does, plain error exists.   If not, the conviction will stand.   We conclude that, to ensure consistency going forward, the appropriate question under the prejudice prong in a plain error analysis is whether there is a reasonable probability that the result would have been more favorable to the defendant had the error not occurred. *See United*

*Olson v. State*, 2023 WY 11, ¶ 18, 523 P.3d 910, 915 (Wyo. 2023) ("An error is prejudicial when there is a reasonable probability that the result would have been more favorable to the defendant had the error not occurred." (quoting *Gilbert v. State*, 2022 WY 62, ¶ 38, 509 P.3d 928, 939 (Wyo. 2022))). "In determining whether a defendant was prejudiced, we review the entire record." *Olson*, ¶ 18, 523 P.3d at 915 (quoting *Klingbeil v. State*, 2021 WY 89, ¶ 44, 492 P.3d 279, 289 (Wyo. 2021) (quoting *Hathaway v. State*, 2017 WY 92, ¶ 33, 399 P.3d 625, 634 (Wyo. 2017))).

[¶34] "[P]erhaps the single most significant factor in weighing whether an error was harmful is the strength of the case against the defendant." *Hathaway*, ¶ 33, 399 P.3d at 634–35 (quoting *Sweet v. State*, 2010 WY 87, ¶ 31, 234 P.3d 1193, 1205 (Wyo. 2010) (quoting 3B Charles A. Wright et al., *Federal Practice and Procedure* § 854, at 305 (2d ed. 1982))). Other factors that may be considered in determining prejudice are: "(1) whether the evidence furnished important corroboration of other testimony; (2) whether it related to a material, consequential fact; (3) whether counsel relied on the evidence in argument; (4) whether the evidence was cumulative; and (5) the effect of any instructions given to the jury." *Id.* (quoting *Zabel v. State*, 765 P.2d 357, 362 (Wyo. 1988) (citing 1 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence*, § 103[06] (1986))).

[¶35] We conclude there is no reasonable probability the verdict might have been more favorable to Ms. Sullivan had Father's inadmissible testimony been excluded and Exhibit 1 not been admitted. The State's case was a strong one. The State presented multiple witnesses describing the events leading up to the stabbing. Witnesses who had interacted with Mr. Moore shortly before the stabbing testified he was in a good mood, while Ms. Sullivan was angry with Mr. Moore and was yelling at him. Ms. Hikawai, who was present when the stabbing took place, testified that she did not hear Mr. Moore attack Ms. Sullivan. Ms. Sullivan's own testimony revealed that she had been angry with Mr. Moore in the days leading up to the shooting. She admitted she was "enraged" before stabbing him, and she texted Ms. Hikawai she was "[a]bout to stab" Mr. Moore the morning before she stabbed him. Three witnesses who examined Ms. Sullivan at the hospital testified that she denied "being in an altercation" with Mr. Moore and denied being "hit or struck" by him. Other than a self-inflicted knife wound, hospital staff did not find any wounds or signs of assault on Ms. Sullivan's body. Ms. Sullivan did not tell Detective Gardner that she had acted in self-defense, but said she was "enraged." The strength of the State's case weighs in favor of finding harmless error.

---

States v. Dominguez Benitez*, 542 U.S. 74, 81, 124 S.Ct. 2333, 2339, 159 L.Ed.2d 157 (2004) (applying the "reasonable probability" standard to plain error analysis).
*Larkins v. State*, 2018 WY 122, ¶ 94, 429 P.3d 28, 49–50 (Wyo. 2018). We will apply the reasonable probability standard to the errors argued by Ms. Sullivan where she bears the burden of establishing erroneously admitted evidence materially prejudiced her.

[¶36]  Other prejudice factors also weigh in favor of harmless error.  Although it was not cumulative, Father's testimony about their family dog and Mr. Moore's favorite place in New Zealand did not relate to any material issue.  Father's testimony was brief, and the admission of Exhibit 1 was a minor aspect of this case.  The State did not mention Father's testimony or Exhibit 1 in its closing.  Ms. Sullivan referenced Exhibit 1 to argue Mr. Moore was strong and physically imposing.  In rebuttal closing, the State used Exhibit 1 to argue the implausibility of Ms. Sullivan's explanation of how she stabbed Mr. Moore.  Finally, the jury instructions cautioned the jury to remain impartial and to not base its decision on sympathy.  These facts weigh in favor of harmless error.

[¶37]  Ms. Sullivan argues Exhibit 1 was inherently prejudicial because it was introduced so the jury would sympathize with Mr. Moore and his father—she states, "it is hard to imagine a more sympathetic picture that could be admitted."  In *Wilks* we found that the victim's in-life photograph was not inherently prejudicial "especially . . . where the jury . . . also view[ed] autopsy or crime scene photographs showing the victim . . . ."  *Wilks*, ¶ 14, 49 P.3d at 983; *see also Munda*, ¶ 21, 535 P.3d at 528 (to establish material prejudice the appellant must show that the evidence was "extremely inflammatory or [was] introduced . . . [to] inflam[e] the jury" (quoting *Proffit*, ¶ 16, 191 P.3d at 969)).  The same holds true here, where the jury saw photographs of the autopsy, including Mr. Moore's stab wound.  Exhibit 1 was not inherently prejudicial, nor was it extremely inflammatory.  *See People v. Parker*, 510 P.3d 404, 442–43 (Cal. 2022) (admission of photo of victim with her dog was not prejudicial), *reh'g denied* (Aug. 10, 2022); *Thurber*, 420 P.3d at 436 (in-life photo of victim was not unduly prejudicial where it was not accompanied by personal details and was displayed briefly at the beginning of trial).

[¶38]  In light of all the evidence introduced at trial, the admission of Father's testimony and Exhibit 1 did not materially prejudice Ms. Sullivan.  There is no reasonable probability the verdict might have been more favorable to Ms. Sullivan had the challenged evidence been excluded.  We find the admission of Father's testimony and Exhibit 1 was harmless error.

## II.    *Did the prosecutor commit misconduct by advocating for the admission of the photograph and Father's testimony?*

[¶39]  Ms. Sullivan argues that the prosecutor committed misconduct when he asserted the purposes of Father's testimony and Exhibit 1 were to prove Mr. Moore was alive at the time of the stabbing and to establish where the stab wound would have been in relation to the ground.  She contends these proffered reasons for admission of the evidence were disingenuous because there was no dispute that Mr. Moore was alive when he was stabbed.  Exhibit 1 could not have been used for the stated purpose of illustrating the height of the stab wound since it depicted Mr. Moore kneeling, and the part of his body where the stab wound was located was not visible in the photograph.

[¶40]  "Prosecutorial misconduct 'claims are intended to address gross prosecutorial improprieties that have deprived a criminal defendant of his or her right to a fair trial.'" *Sanchez v. State*, 2024 WY 80, ¶ 12, 552 P.3d 399, 404 (Wyo. 2024) (quoting *Soares v. State*, 2024 WY 39, ¶ 30, 545 P.3d 871, 878–79 (Wyo. 2024)).  Ms. Sullivan did not raise a prosecutorial misconduct objection below, so we review for plain error.  *Sanchez*, ¶ 12, 552 P.3d at 404; *Black v. State*, 2017 WY 135, ¶ 13, 405 P.3d 1045, 1050 (Wyo. 2017). "To establish plain error, 'an appellant must prove: "1) the record clearly reflects the incident urged as error; 2) a violation of a clear and unequivocal rule of law; and 3) that he was materially prejudiced" by the alleged error.'"  *Sanchez*, ¶ 12, 552 P.3d at 404 (quoting *Soares*, ¶ 18, 545 P.3d at 877); *Larkins v. State*, 2018 WY 122, ¶ 93, 429 P.3d 28, 49 (Wyo. 2018) ("Plain error review is the same regardless of whether the issue involved jury instructions, evidence, or prosecutorial misconduct.").  "Failure to establish any of the three elements precludes a finding of plain error."  *Sanchez*, ¶ 12, 552 P.3d at 404 (citing *Soares*, ¶ 18, 545 P.3d at 877).  "Where appropriate, we address the prejudice element of the plain error test first, without addressing whether there has been a violation of a clear and unequivocal rule of law."  *Leners v. State*, 2021 WY 67, ¶ 23, 486 P.3d 1013, 1018 (Wyo. 2021) (quoting *Lewis v. State*, 2018 WY 136, ¶ 13, 430 P.3d 774, 777 (Wyo. 2018)).

> Both prosecutorial misconduct and plain error require an appellant to establish material prejudice to warrant reversal.  *Bogard v. State*, 2019 WY 96, ¶ 71, 449 P.3d 315, 332 (Wyo. 2019).  "[T]he appellant must establish he suffered material prejudice from the error by demonstrating it is reasonably probable he would have received a more favorable verdict if the error had not been made."  *Weston* [*v. State*, 2019 WY 113], ¶¶ 34–41, 451 P.3d [758,] 768–69 [(Wyo. 2019)] (citing *Sindelar v. State*, 2018 WY 29, ¶ 20, 416 P.3d 764, 770 (Wyo. 2018) (plain error); *Farrow v. State*, 2019 WY 30, ¶ 72, 437 P.3d 809, 827 (Wyo. 2019) (ineffective assistance of counsel)); *see also Bogard*, ¶¶ 71–72, 449 P.3d at 332 (prosecutorial misconduct).

*Leners*, ¶ 24, 486 P.3d at 1018.

[¶41]   The first element of plain error is established—the prosecutor's rationale for seeking the admission of the challenged evidence is contained in the record.  Regarding the second element, Ms. Sullivan argues that the prosecutor violated Rule 3.3(a) of the Wyoming Rules of Professional Conduct for Attorneys at Law which establishes a duty of candor and prohibits attorneys from knowingly making "a false statement of fact or law to a tribunal." W.R.P.C. 3.3(a)(1).  Even if we were to assume that the prosecutor violated his duty of candor when advocating for the admission of Father's testimony and Exhibit 1, as we

explained in the preceding sections, that evidence did not materially prejudice Ms. Sullivan. *See supra* ¶¶ 33–38.[8] Ms. Sullivan has not established plain error.

## *CONCLUSION*

[¶42] Exhibit 1 and Father's testimony concerning Mr. Moore's demeanor, his favorite vacation spots, and the family dog were irrelevant and therefore inadmissible. Admission of this evidence was harmless error because it did not materially prejudice Ms. Sullivan. For the same reason, Ms. Sullivan has not established prosecutorial misconduct. We affirm.

---

[8] Ms. Sullivan argues here as she did on the evidentiary errors that to establish prejudice, she must establish a "reasonable *possibility* that the verdict might have been more favorable" absent the error. *See* footnote 7, *supra*.