# THE SUPREME COURT, STATE OF WYOMING

# 2025 WY 44

**APRIL TERM, A.D. 2025**

**April 21, 2025**

WILLIAM COREY HOLLIDAY,

**Appellant**
**(Defendant),**

v.

S-24-0179

THE STATE OF WYOMING,

**Appellee**
**(Plaintiff).**

*Appeal from the District Court of Sheridan County*
*The Honorable Darci A.V. Phillips, Judge*

*Representing Appellant:*
Office of the State Public Defender: Brandon Booth, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; H. Michael Bennett, Senior Assistant Public Defender. Argument by Mr. Bennett.

*Representing Appellee:*
Bridget Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; John J. Woykovsky, Senior Assistant Attorney General. Argument by Mr. Woykovsky.

*Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN, and JAROSH, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FENN, Justice.**

[¶1]    Following a jury trial, William Corey Holliday was convicted of 15 counts of burglary.  On appeal, he asserts the prosecutor committed misconduct by vouching for the element of identity by referring to the person shown in the surveillance videos as "the Defendant" when questioning two of the witnesses.  We affirm.

## ISSUE

[¶2]    Mr. Holliday raises a single issue: Did the prosecutor commit misconduct by vouching for the element of identity?

## FACTS

[¶3]    Between October 31, 2022, and February 9, 2023, several burglaries were committed in Sheridan County.[1]  These burglaries occurred in the late night and early morning hours.  Many of these incidents were caught on surveillance videos, which showed a suspect wearing a beanie, a facemask, and a hooded sweatshirt or silver puffer jacket entering vehicles and garages.  Some of the videos showed the suspect holding a flashlight in his hand while peering into vehicles and garages.  The suspect also left distinctive footprints in the snow at many of the locations where these burglaries took place.

[¶4]    By mid-February 2023, the Sheridan County Sheriff's office identified Mr. Holliday as a suspect in these burglaries.  The Sheriff's office asked the Wyoming Division of Criminal Investigation (DCI) for assistance in locating Mr. Holliday and obtaining surveillance photographs of him and his vehicle.  A DCI agent photographed Mr. Holliday driving a white Toyota like one spotted in the vicinity of the burglaries and wearing clothing like that worn by the suspect in the surveillance videos.

[¶5]    On March 2, 2023, deputies conducted a search of Mr. Holliday's residence and vehicle.  They located articles of clothing similar to that worn by the suspect on the surveillance videos and shoes consistent with the footprints that were left at the scenes of the burglaries.  Deputies conducted a second search of Mr. Holliday's residence on March 21, 2023, and they located a customized golf club reported missing from one victim's garage and a set of wooden nesting boxes reported missing from another victim's vehicle.  Mr. Holliday was arrested and charged with 20 counts of burglary.  The information was amended multiple times, and by the time his case came to trial, Mr. Holliday faced 23 counts of burglary.

---

[1] Although Mr. Holliday was also charged with 10 counts of burglary in Johnson County, only his Sheridan County charges are at issue in this appeal.

[¶6]    Mr. Holliday's trial began on November 3, 2023, and lasted for six days. Approximately 50 witnesses testified.  While questioning the second witness, MW, about what she observed on one of the surveillance videos, the following exchange took place:

> [THE PROSECUTOR]:  Is this your video?
>
> [M.W.]:  Yes, it is.
>
> [THE PROSECUTOR]:   And does it show what you have described to the jury?
>
> [M.W.]:  Yes.
>
> [THE PROSECUTOR]:  Can you see the light go on in that video?
>
> [M.W.]:  Yes.
>
> [THE PROSECUTOR]:  Is the Defendant holding anything?

[¶7]    Defense counsel objected to the prosecutor's use of the word "Defendant," and the district court sustained this objection.  The prosecutor subsequently asked MW if "the person in that video appear[ed] to have anything in their hand[.]"  MW testified it appeared the person was holding a flashlight.

[¶8]    While questioning Deputy Boot Hill on the fifth day of trial, the prosecutor again referred to the individual in the surveillance videos as "the Defendant."  The first incident occurred when the prosecutor was asking Deputy Hill questions about what he observed on the surveillance videos:

> [THE PROSECUTOR]: You testified that you viewed all of the surveillance videos; correct?
>
> [Deputy Hill]: Correct.
>
> [THE PROSECUTOR]:  And in those surveillance videos, can you see the [D]efendant's hands?
>
> [Deputy Hill]:  Yes.
>
> [THE PROSECUTOR]:  And in the ones where you can see his hands, are there occasions where he is holding something in his hand?

[Deputy Hill]:  Yes.

[THE PROSECUTOR]:  And is there a particular hand that he tends to be holding something in when you can see him holding something in his hand?

[Deputy Hill]:  Yes.

[THE PROSECUTOR]:  What is that?

[Deputy Hill]:  His right hand.

[THE PROSECUTOR]:  And when he is holding something in his right hand, when you review the surveillance footage, what is it that you see?

[DEFENSE COUNSEL]: Objection as to speculation, Your Honor.

THE COURT: Overruled

THE WITNESS:  A flashlight.

Defense counsel did not object to the State's use of the word "Defendant."

[¶9]    The next incident occurred when the prosecutor was asking Deputy Hill questions about photographs taken during the search of Mr. Holliday's home:

[THE PROSECUTOR]:  States Exhibit 130, do you recognize what it is, what it contains?

[Deputy Hill]:  Four photographs?

[THE PROSECUTOR]:  Four photographs of what?

[Deputy Hill]:  Clothing mostly.

[THE PROSECUTOR]:  Where?

[Deputy Hill]:  The two top left and bottom left are of the closet near the front door of the residence.  The two on the right top and bottom are in the bedroom we just spoke about.

3

[THE PROSECUTOR]: And does it show any particular kind of clothing in the shots that are in the bedroom?

[Deputy Hill]: Just the two on the left are jackets and shoes that were found or that were in those -- in that closet. And then the two on the right show winter pants, snow pants.

[THE PROSECUTOR]: In any of the videos that you reviewed, is the person portrayed possibly wearing something like snow pants?

[Deputy Hill]: It appears to be, yeah.

[THE PROSECUTOR]: And did you also find any blue jeans or anything like that in the room yourself?

[Deputy Hill]: Yes.

[THE PROSECUTOR]: And in any of the videos you reviewed, is the Defendant wearing darker winter clothing?

[DEFENSE COUNSEL]: Objection; leading.

THE COURT: Overruled.

[Deputy Hill]: Yes.

Although defense counsel made an objection based on leading, he did not object to the State's use of the word "Defendant."

[¶10] The final incident occurred a couple of minutes later while the prosecutor was questioning Deputy Hill about items found during the search of Mr. Holliday's home and vehicle:

[THE PROSECUTOR]: And the photograph on the upper left?

[Deputy Hill]: That is the close-up of this (indicating), of the jackets in this closet.

[THE PROSECUTOR]: All right. And that closet is the closet where you found a shoe of interest?

4

[Deputy Hill]:  Yes, it is.

[THE PROSECUTOR]:  In any of the videos that you reviewed, does the Defendant appear to be wearing gloves?

[Deputy Hill]:  Yes.

[THE PROSECUTOR]:  Did you find any gloves in either the residence or the vehicle?

[Deputy Hill]:  Yes. Both.

[THE PROSECUTOR]:  Could you go to State's Exhibit 131, please.

[Deputy Hill]:  (The witness complied)

[THE PROSECUTOR]:  Do you recognize what I am showing you?

[Deputy Hill]:  I do.

[THE PROSECUTOR]:  What is State's Exhibit 131?

[Deputy Hill]:  There are three photographs depicting gloves found in both [the] residence and the car of Mr. Holliday.

Defense counsel did not object to the State's use of the word "Defendant."

[¶11]  Over the lunch break, the prosecutor alerted the district court and defense counsel he had inadvertently used the word "Defendant" in his questioning of Deputy Hill, and he had not realized it until it was brought to his attention by the second chair prosecutor.  The district court gave the jury the following curative instruction proposed by defense counsel:

> During his recent questioning of Deputy Hill, the prosecutor framed three of his questions by asking Deputy Hill whether a surveillance video showed, quote, the Defendant holding an item in his hands.  Both the court and counsel for William Holliday missed these references.  This framing of these questions, even if inadvertent, intruded upon the province of the jury to determine the identity of the person or persons in the surveillance videos.  To the extent that any jurors took note of the form of these questions, the jury is to disregard any

5

assertion made in the questions that the video showed the Defendant doing anything. The question of whether the video contained footage of the Defendant is solely one for the jury to decide beyond a reasonable doubt.

[¶12] During the final jury instruction conference, defense counsel asked to have the curative instruction included in the packet of instructions that would be sent back with the jury. After discussing the issue with the parties, the district court decided a modified curative instruction would be given to the jury. The district court included the following instruction in the packet that was given to the jurors:

The question of whether any videos contained footage of the Defendant is solely one for the jury to decide beyond a reasonable doubt.

[¶13] On the last day of the trial, the State amended the information again to dismiss five counts. The jury was presented with a verdict form containing 18 counts of burglary. The jury ultimately found Mr. Holliday guilty of 15 counts and not guilty of 3 counts. The district court sentenced Mr. Holliday to 5 to 10 years in prison on each count, with all 15 sentences to be served concurrently. This appeal timely followed.

## STANDARD OF REVIEW

[¶14] Mr. Holliday objected to one instance of alleged prosecutorial misconduct below. Where there has been an objection below, we apply a harmless error standard. *Black v. State,* 2017 WY 135, ¶ 13, 405 P.3d 1045, 1050 (Wyo. 2017). Under this standard, the Court focuses on whether the alleged error "affected the accused's 'substantial rights.'" *Id.* (quoting *McGinn v. State*, 2015 WY 140, ¶ 13, 361 P.3d 295, 299 (Wyo. 2015)). "Before we hold that an error has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that, based on the entire record, a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable to the accused." *Id.* "To demonstrate harmful error, the defendant must show prejudice under 'circumstances which manifest inherent unfairness and injustice or conduct which offends the public sense of fair play.'" *Id.* (quoting *McGinn*, ¶ 13, 361 P.3d at 299).

[¶15] Mr. Holliday did not object to the other three instances of alleged misconduct, so we review those incidents for plain error. *Sullivan v. State*, 2025 WY 5, ¶ 40, 561 P.3d 780, 790 (Wyo. 2025) (quoting *Sanchez v. State*, 2024 WY 80, ¶ 12, 552 P.3d 399, 404 (Wyo. 2024)). "To establish plain error, 'an appellant must prove: "1) the record clearly reflects the incident urged as error; 2) a violation of a clear and unequivocal rule of law; and 3) that he was materially prejudiced" by the alleged error.'" *Id.* To establish material prejudice, Mr. Holliday "must show a 'reasonable probability' of a more favorable verdict absent the error." *Id.* at ¶ 19, 561 P.3d at 786 (quoting *Munda v. State*, 2023 WY 90, ¶ 21, 535 P.3d

523, 528 (Wyo. 2023)).  "Failure to establish any of the three elements precludes a finding of plain error." *Id.* at ¶ 40 (quoting *Sanchez,* ¶ 12, 552 P.3d at 404).  "Where appropriate, we address the prejudice element of the plain error test first, without addressing whether there has been a violation of a clear and unequivocal rule of law." *Id.* (quoting *Leners v. State*, 2021 WY 67, ¶ 23, 486 P.3d 1013, 1018 (Wyo. 2021)).

## **DISCUSSION**

[¶16]  Although Mr. Holliday uses the term "vouching," he asserts the prosecutor in this case committed misconduct by expressing his personal belief about the identity of the prowler.  He asserts the element of identity was central to the State's case against him, and these improper statements "abrogated the State's burden [of] proving all of the elements against Mr. Holliday beyond a reasonable doubt."

[¶17]  Though we affirm because Mr. Holliday failed to show he was prejudiced by the prosecutor's statements, some discussion of the prosecutor's conduct is warranted.  Prosecutorial misconduct is "a prosecutor's improper or illegal act (or failure to act), especially involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment." *Soares v. State*, 2024 WY 39, ¶ 30, 545 P.3d 871, 878–79 (Wyo. 2024) (quoting *Freer v. State*, 2023 WY 80, [¶ 25], 533 P.3d 897, [904–05] (Wyo. 2023)).  "Prosecutorial misconduct 'claims are intended to address gross prosecutorial improprieties that have deprived a criminal defendant of his or her right to a fair trial.'" *Sullivan,* 2025 WY 5, ¶ 40, 561 P.3d at 790 (quoting *Sanchez*, 2024 WY 80, ¶ 12, 552 P.3d at 404).  It is improper for a prosecutor to express his or her personal belief or opinion on the guilt of the defendant. *Anderson v. State*, 2022 WY 119, ¶ 38, 517 P.3d 583, 594 (Wyo. 2022) (quoting *Buszkiewic v. State*, 2018 WY 100, ¶ 19, 424 P.3d 1272, 1278 (Wyo. 2018)).  When evaluating whether a prosecutor expressed his personal beliefs or opinions to the jury, we must consider his statements in context. *Id.*

[¶18]  From the beginning of this case, the prosecutor informed the jury the person in the videos could not be easily identified, and it was the State's contention Mr. Holliday was the man who committed the burglaries.  The State set out the evidence it intended to present during the trial and repeatedly told the jury they would have to make their own comparisons and decide for themselves what that evidence meant.  The prosecutor reminded the jury the State had the burden of proving beyond a reasonable doubt Mr. Holliday committed these crimes.  Throughout the trial, the prosecutor invited the jury to make their own comparisons between the evidence found at the scenes of the burglaries and items seized from Mr. Holliday's residence and vehicle.  The four statements challenged by Mr. Holliday occurred with two out of fifty witnesses over the course of a six-day trial.

[¶19]  When the prosecutor brought the final three of these challenged statements to the district court's attention, he explained:

I guess the record that I would make is that, yes, these were inadvertent. I didn't notice them at the time and [Second Chair Prosecutor] did. But it was not brought to my attention until we actually broke. I think as I was going back and forth between the defendant's residence and things in the video, I think that that's probably what generated this inadvertently.

[¶20] When viewed in the context of the entire trial, it is clear the prosecutor was not expressing his personal opinion or beliefs about Mr. Holliday's guilt. Rather, when switching back and forth between questions about what was found in Mr. Holiday's residence and what could be seen on the videos, he inadvertently used the word "defendant" to describe the person in the video on four isolated occasions. While these references do not amount to prosecutorial misconduct, they were nonetheless improper. *See State v. Singh*, 243 A.3d 662, 673 (N.J. 2021) ("[A] reference to 'defendant,' which can be interpreted to imply a defendant's guilt—even when, as here, they are used fleetingly and appear to have resulted from a slip of the tongue—should be avoided in favor of neutral, purely descriptive terminology such as 'the suspect' or 'a person.'"). We must determine whether the prosecutor's improper references to "the defendant" require reversal of Mr. Holliday's convictions.

[¶21] As discussed above, both harmless error and plain error require an appellant to establish material prejudice to warrant reversal. *Sullivan*, 2025 WY 5, ¶ 40, 561 P.3d at 790 (quoting *Sanchez*, 2024 WY 80, ¶ 12, 552 P.3d at 404); *Black*, 2017 WY 135, ¶ 13, 405 P.3d at 1050 (quoting *McGinn*, 2015 WY 140, ¶ 13, 361 P.3d at 299). The single most significant factor in determining whether Mr. Holliday was prejudiced by the improper statements is the strength of the State's case against him. *Sullivan*, ¶ 34, 561 P.3d at 789 (citing *Hathaway v. State*, 2017 WY 92, ¶ 33, 399 P.3d 625, 634–35 (Wyo. 2017)). Another important consideration in this case is the effect of the district court's instructions to the jury. *Id.*

### A. The Strength of the State's Case

[¶22] Although much of the evidence was circumstantial, the State presented overwhelming proof of Mr. Holliday's guilt. Numerous witnesses testified about the distinctive footprints the suspect left at the scenes of the burglaries. Deputies seized shoes from Mr. Holliday's home with tread patterns consistent with those distinctive footprints found at the scenes of some of the burglaries. Deputies also found distinctive tire tracks near some of the burglaries. From these tracks, the deputies were able to determine the vehicle had two separate types of tires with different tread patterns. When deputies seized Mr. Holliday's vehicle, they discovered it had tires with two different tread patterns that matched the tire tracks found at the scenes of some of the burglaries.

8

[¶23] The State introduced videos of a white, four-door sedan seen in the vicinity of some of the burglaries. The State presented evidence Mr. Holliday's white Toyota Camry had unique characteristics consistent with the vehicle seen on the videos.

[¶24] During the search of Mr. Holliday's home, deputies found clothing consistent with what the individual was wearing in the surveillance videos, including a silver puffer jacket and multiple beanies. In addition, when searching Mr. Holliday's vehicle, deputies found a facemask, orange beanie, and multiple flashlights consistent with the ones seen in several of the surveillance videos.

[¶25] During the second search of Mr. Holliday's home, deputies recovered a customized golf club and a unique set of wooden nesting boxes taken from two of the victims. The evidence established Mr. Holliday made large cash deposits into his bank account around the same time cash went missing from two of the victim's vehicles.

[¶26] The State admitted evidence from Mr. Holliday's fitness app on his iPhone. This evidence showed Mr. Holliday was awake and physically active during the hours the burglaries occurred. The State called an expert witness who used the location data from Mr. Holliday's cell phone to establish his iPhone was in the vicinity of the burglaries on the dates the crimes occurred.

[¶27] A friend and former employer of Mr. Holliday testified when she first saw the surveillance videos of one of the burglaries, which had been posted to Facebook, she immediately believed the person on the video was Mr. Holliday. She testified the person on the video has the same small stature, mannerisms, and movements as Mr. Holliday, and the person on the video appears to be "pretty confident and cocky, which is exactly who Mr. Holliday is." In addition, the director of the program where Mr. Holliday was employed from January to February 2023 testified he was frequently late to work during this time. Mr. Holliday claimed he was late because he was tired, had not slept, could not get enough rest, and there were things going on at home.

[¶28] As set out above, the evidence against Mr. Holliday was substantial. Given the strength of that evidence, we are simply not persuaded a reasonable probability exists but for the prosecutor's four improper statements the outcome of his trial would have been different. Mr. Holliday failed to meet his burden of showing he was materially prejudiced by these statements under either a harmless error or plain error standard of review. *See Sullivan*, 2025 WY 5, ¶ 19, 561 P.3d at 786 (quoting *Munda*, 2023 WY 90, ¶ 21, 535 P.3d at 528); *Black,* 2017 WY 135, ¶ 13, 405 P.3d at 1050 (quoting *McGinn*, 2015 WY 140, ¶ 13, 361 P.3d at 299).

## B. Effect of District Court's Curative Instructions

[¶29] Although we found Mr. Holliday failed to show material prejudice, we also note

any prejudice he might have suffered was mitigated by the district court's use of curative instructions. We have long recognized "[a]ppropriate objections and subsequent curative instructions may cure an error at trial." *Warner v. State*, 2001 WY 67, ¶ 21, 28 P.3d 21, 28 (Wyo. 2001) (quoting *Rubio v. State,* 939 P.2d 238, 244 (Wyo. 1997)). Although curative instructions "cannot take the sting out of every mistake," our general rule is "[w]e must assume that the jury followed the court's curative instruction." *Metzger v. State*, 4 P.3d 901, 908 (Wyo. 2000) (citing *Burke v. State,* 746 P.2d 852, 857 (Wyo. 1987); *Zabel v. State*, 765 P.2d 357, 363 (Wyo. 1988)). In this case, the jury was instructed to disregard the prosecutor's framing of these four questions, and it was twice instructed it was solely up to the jury to decide if Mr. Holliday was the person in the surveillance videos. In this case, the district court's remedial action was immediate and comprehensive, and we opt to follow our general rule and assume the jury obeyed the corrective instructions issued by the district court. *See Metzger*, 4 P.3d at 908. The curative instructions alleviated any possible prejudice to Mr. Holliday. *Ryan v. State*, 988 P.2d 46, 61 (Wyo. 1999).

## **CONCLUSION**

[¶30] Mr. Holliday failed to show he was materially prejudiced by the prosecutor's improper references to "the Defendant" while questioning two witnesses, and any possible prejudice that could have arisen from the four improper questions was alleviated by the curative instructions given by the district court. Affirmed.

10